JANUARY TERM, 1874.        197

The State vs. The West Wisconsin Railway Company.

THE STATE VS. THE WEST WISCONSIN RAILWAY COMPANY.

CONSTITUTIONAL LAW:  JURISDICTION OF SUPREME COURT:  QUO WAR-
RANTO.  *Jurisdiction of supreme court in an action of quo warranto
against a railroad corporation, to declare a forfeiture of its charter.
Cannot appoint receiver and distribute property.* — *Mode of further pro-
cedure in such case.*

1. That clause of sec. 3, art. VII of the constitution of this state, which
   authorizes the supreme court to issue the "writ of *quo warranto,*"
   must be understood as intended to give the court jurisdiction of all
   cases in which the *information* in the nature of a *quo warranto* has
   been used in modern times as a substitute for the ancient and obsolete
   writ.  *Attorney General v. Blossom,* 1 Wis., 317; *Attorney General v.
   Barstow,* 4 id., 567; *State v. Messmore,* 14 id., 115.
2. Under the constitution of this state, no *original equity jurisdiction* (ex-
   cept to issue the writ of injunction) is conferred on the *supreme court,*
   or can be conferred upon it by act of the legislature.  *State v. Wau-
   paca Co. Bank,* 20 Wis., 640.
3. This court, therefore, upon rendering a *judgment of dissolution* against a
   *corporation,* will have no power to appoint a receiver, or to take an
   account and make distribution of the property among creditors and
   stockholders.
4. But in such a case the personal property will *not* go to the state, and the
   real property revert to the original owners, leaving the creditors of the
   corporation without a remedy; but the mode of procedure will be the
   same as in the case of a *voluntary dissolution* of a corporation, and as
   provided in secs. 8, 9, ch. 78, R. S.

Action in the nature of a *quo warranto,* commenced in this
court, by the attorney general, on the 29th of August, 1873, on
leave granted by the court, to have a forfeiture of defendant's
charter adjudged, and the corporation dissolved.  The com-
plaint contains the necessary averments to show the incorpo-
ration of the "Tomah & Lake St. Croix Railroad Company"
by act of the legislature of this state in 1863 (P. & L. Laws of
1863, ch. 243); and the change of the name of said company
in 1866 to the "*West Wisconsin Railway Company,*" pursuant
to an act of the legislature of that year.  It then recites the

following acts of congress and of the legislature of this state, respectively: (1.) An act of congress "granting public lands to the state of Wisconsin to aid in the construction of railroads in that state," approved June 3, 1856. This act, among other things, grants certain lands to this state to aid in constructing a railroad from Madison or Columbus by the way of Portage City to the St. Croix river or lake, between two specified townships, and thence to the west end of Lake Superior, etc. (2.) An act of the legislature of this state entitled "An act to accept the grant and execute the trust conferred upon the state" by the aforesaid act of congress. (3.) An act of congress, approved May 5th, 1864, entitled "An act granting lands to aid in the construction of railroads in the state of Wisconsin." This act grants certain lands to the state "for the purpose of aiding in the construction of a railroad from the town of Tomah in the county of Monroe in said state, to the St. Croix river or lake," etc., etc. (4.) Joint resolution of the legislature of this state, March 20, 1865, accepting the lands granted by the act of congress last mentioned. (5.) An act of the legislature of this state, of April 1st, 1863, incorporating the defendant company, and defining its powers. The complaint avers that by these acts the defendant was authorized to locate, construct, complete, alter, change the location of, reconstruct, maintain and operate a railroad with one or more tracks or lines, on such route and with such allignments and graduation as said company should think proper, from such point as the directors should determine "in the town of Tomah in the county of Monroe, or on the track of the La Crosse & Milwaukee railroad, or of any other railroad running out of Tomah, by way of Black River Falls, thence by the most direct and feasible route to such point on Lake St. Croix," etc. etc.; and that by said act of 1863 it was further provided that for the purpose of aiding in the construction of said railroad, there was thereby granted to the "Tomah & Lake St. Croix Railroad Company," all the interest and estate, present and prospective, of the state in and to so

JANUARY TERM, 1874. 199

The State vs. The West Wisconsin Railway Company.

much of the lands granted by the government of the United States to the state of Wisconsin for the purpose of aiding in the construction of a railroad from Madison or Columbus by way of Portage City to the St. Croix river or lake, and from thence to Lake Superior, etc., as was or could be made applicable to the construction of that part of said railroad lying between the village of Tomah in the county of Monroe, and Lake St. Croix, with all the rights, etc., conferred by said act of congress; that whenever twenty continuous miles of said railroad between Tomah and Lake St. Croix should have been completed, the governor of this state should certify that fact to the, secretary of the interior, and thereupon the title to one hundred and twenty sections of said land should vest in said railroad company, and when a second twenty continuous miles of the road should have been completed so as to admit of running regular trains on the same, the governor should certify as above, and thereupon a further quantity of one hundred and twenty sections of said land should vest in said company, and so on until said road should be completed. (6.) An act of the legislature of this state approved March 29, 1865, entitled "An act to confer upon the Tomah & Lake St. Croix Railroad Com pany all the rights and privileges granted and conferred to the state of Wisconsin by the acts of congress approved June 3, 1856, and May 5, 1864." This act, by its terms, grants to the Tomah & Lake St. Croix Railroad Company, all the rights, privileges and interest granted to and bestowed upon this state by the above mentioned act of congress of 1864, in the lands mentioned in said act and granted to and conferred upon the state "for the purpose of aiding in the construction of a rail road from the town of Tomah in the county of Monroe, in said state, to the St. Croix river or lake," etc.; and all the grants of lands, rights and privileges theretofore made by this state to said company "to aid in building said railroad as above de scribed," which lands, rights, etc., "were embraced in the act of congress" of June 2, 1856, are confirmed.

The complaint, after reciting at some length the statutes above named, alleges that in 1866 the defendant company accepted the several grants of land so conferred upon it, upon the terms and .conditions in said act prescribed, and located the line of its railroad from a point of connection with the road of the Milwaukee & St. Paul Railway Company near the depot of the last mentioned company, adjoining the village of Tomah in the town of Tomah in the county of Monroe in said state, by the way of Warren's Mills, to Black River Falls in the county of Jackson, and thence in a northwesterly direction to Hudson in the county of St. Croix; that afterwards, in 1867, defendant completed its road, upon the line so located, to Black River Falls, and thereafter, and prior to the first day of January, 1871, completed its road to said city of Hudson, and prior to the first day of November, 1872, further extended its road to the city of St. Paul, and equipped and operated the same and the several parts thereof for the transportation of freight and passengers between its terminus in the town of Tomah aforesaid and the several points on said road northwesterly thereof; that after said line of road was located as aforesaid; defendant made, adopted and certified a plat of the location thereof, and filed it in the office of the proper department of the United States government, at Washington, for the purpose of securing to itself the lands so granted as aforesaid; that from time to time, as the work progressed, and said company became entitled thereto, the governor of this state duly conveyed to said company the lands granted as aforesaid, and after the completion of said road, and prior to the first of November, 1872, the governor, in pursuance of the several acts above mentioned, had conveyed to defendant *all* the lands so granted for the construction of said road, amounting to about six hundred thousand acres, of the value of more than three millions of dollars.

The complaint then further alleges, that in the summer of 1872, defendant built a new line of railroad from Warren's Mills to a point in connection with said railroad of the Mil-

waukee & St. Paul Railway Company at Camp Douglas in the county of Juneau, a point about thirteen and a half miles eastwardly of the terminus of said road as originally located in said town of Tomah ; that no part of said last mentioned line runs to or passes through said town of Tomah ; and that afterwards, on or about November 24, 1872, defendant removed its rolling stock from so much of said road, as originally located and constructed, as lay between Warren's Mills and the eastern terminus thereof in the town of Tomah and near the village of Tomah, a distance of about ten miles, and took up and removed the track, rails and ties therefrom, and wholly abandoned the use thereof, and from thence hitherto has neglected and refused to relay, equip or operate the same, or run any trains thereon, but instead thereof has used and operated said line of road from Warren's Mills to Camp Douglas as a part of its main line.

The complaint then recites an act of the legislature of this state, approved February 13, 1873, by which the defendant company was required and directed to relay its track from Warren's Mills along and upon the line theretofore used by said company, to the point of connection with the Milwaukee & St. Paul Railway in the village of Tomah, and to equip the same in as good and substantial manner as the road of said company from Warren's Mills was constructed, equipped and maintained, and to complete the same, and put it in operation, and run daily passenger and freight trains on the same, on or before the first of June, 1873, and thereafter to maintain and operate its said road from Tomah to Warren's Mills, and run such daily trains thereon: *provided*, that nothing in said act should be construed so as in any manner to interfere with the operation and use of defendant's road as the same had been constructed and established and was then operated from Warren's Mills through Camp Douglas to Elroy, but nothing in that proviso contained should be construed as a waiver by the state or any of its citizens of any rights or causes of action then existing against such company for the enforcement of its

or their rights in the premises; and it was further provided that in case the defendant company should neglect or refuse to relay its said track from Warren's Mills to Tomah within the time and in the manner required by the act, or to maintain and operate it as there provided, the company should, by such neglect or refusal, forfeit all rights, franchises, powers, privileges and grants conferred upon it by the incorporating act of April 1, 1863, above mentioned, or by any act amendatory or explanatory thereof. The complaint then alleges that defendant did not, after the passage of the act last aforesaid, and prior to the 1st of June, 1873, relay the track of said railway company from Warren's Mills to the point of connection with the Milwaukee & St. Paul Railway in the village of Tomah, and equip the same in a good and substantial manner, etc., and did not complete the same and put it in operation, or run daily or any passenger or freight trains on the same, but, on the contrary, neglected and refused, during the period aforesaid, and still neglects and refuses, to relay its track on that part of its line extending from Warren's Mills to Tomah. And the plaintiff alleges and insists that the defendant, by abandoning the use of its road between the two points last above named, by taking up and removing its track therefrom, and by neglecting and refusing to relay said track and maintain and operate said road, has forfeited all the rights, franchises, powers, privileges and grants conferred upon said company by its act of incorporation and the several acts amendatory or explanatory thereof; that it has offended against and violated the provisions of said acts; and that it has violated the provisions of the act of 1873, last above recited, and has thereby forfeited its privileges and franchises as a corporation. Prayer, that the defendant's charter be vacated, and the existence of said corporation annulled, and that all the rights, franchises, powers, privileges and grants conferred upon it by the act of incorporation, or any act amendatory or explanatory thereof, be declared and adjudged to be forfeited, and that de-

fendant be excluded from all corporate rights, privileges and franchises, and that said corporation be dissolved, etc.

The defendant demurred to the complaint, on the grounds, 1. That this court had no jurisdiction of the subject matter. 2. That the complaint did not state facts sufficient to entitle the plaintiff to the relief demanded therein, or to any relief.

*Harlow S. Orton*, for the demurrer:

1. The original writ of *quo warranto* embraced only liberties and titles, by statute 18 Edw. I., and was afterwards extended to municipal corporations and public officers; and the proceeding was never made to embrace private corporations until the *writ* was abolished by statute, and an information in the nature of *quo warranto* was substituted. Even then, at common law, and by English statute which constituted a part of the common law when Wisconsin framed the constitution which gives this court original jurisdiction in " writs of *quo warranto*," it was strictly a common law proceeding, and the judgment was final, of ouster, and the franchises went back to the government, and the personal property also went to the crown (in accordance with the common law principle as to the goods of an intestate), while the lands reverted to the original owner. It was not in any sense an equitable or chancery proceeding, by the common law or statutes of England. 2 Coke's Inst., 493, et seq. (Phil. Law Lib., vol. 54) ; Cole on Information, 90, 97, 140 ; 4 Term, 381 ; 2 East, 308 ; 6 id., 356 ; 1 Ld. Raym., 426 ; 8 Peters, 281 ; 15 How. (U. S.), 312 ; 18 id., 480 ; 1 Blackf., 278 ; 23 Pick., 346 ; 2 Kent's Com., 307 ; 1 Wall., 23 ; 8 Ga., 486 ; A. & A. on Corp., §§ 195, 737, 778, 779. 2. In this country the statutes of the several states have given the courts a new jurisdiction, in equity, as against corporations having property, creditors and outstanding contracts, to make the proceeding applicable to the great interests of the public in such corporations, and save the obligation of contracts, vested rights and the public interest. All such statutes, however, give jurisdiction only to courts at *nisi prius*. Statutes of N. Y. ; 4 Cow., 97 ; Statutes

of Ohio of 1842; 13 Ohio, 269; Statutes of Mississippi of 1843; 6 How. (Miss.), 674; 6 Sm. & M., 513; 8 id., 9. The supreme court cannot take this statutory jurisdiction, and has no original equity jurisdiction to grant injunctions. It can only grant injunctions in cases brought to and pending in this court by virtue of its appellate jurisdiction, to save the rights of parties and hold property *pendente lite. Kent v. Mahaffy,* 2 Ohio St., 499; *Griffith v. Commissioners, etc.,* 20 Ohio, 609. 3. The *gravamen* of the complaint is, the removal of ten miles of railroad track at or near Tomah, such removal not being authorized, but prohibited by law, and the failure of the company to restore it as required by the act of 1873. The proper remedy in such a case is not the proceeding by *quo warranto,* but *mandamus.* A. & A. on Corp., § 707; 16 Eng. Law & Eq., 299; 18 id., 222; *King v. Stacey,* 1 Term, 1; 2 Barn. & Ald., 646; 6 Barn. & Cress., 181; 8 Watts & S., 365; 10 Wend., 293. *Quo warranto,* in its event, will only defeat the object sought, and make permanent the nuisance complained of.

*The Attorney General* and *H. L. Palmer, contra:*

1. This court has jurisdiction to grant the relief demanded. (1.) The constitution of this state (art VII, sec. 3) provides that the supreme court "shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same." Under that provision this court has original jurisdiction to entertain all suits in the nature of *quo warranto. Att'y Gen'l v. Blossom,* 1 Wis., 317; *Att'y Gen'l v. Barstow,* 4 id., 567. (2.) Sec. 1, ch. 160, R. S., provides that "the writ of *scire facias,* the writ of *quo warranto,* and proceedings by information in the nature of *quo warranto,* shall be as here prescribed, and the remedies heretofore obtainable in those forms may be obtained by civil action, as now prescribed by law." *State v. Messmore,* 14 Wis., 115. (3.) Sec. 4 of the same chapter provides that " an action may be brought by the attorney general in the name of the state, on leave granted by the supreme court,

The State vs. The West Wisconsin Railway Company.

or judge thereof, for the purpose of vacating the charter or annulling the existence of a corporation," etc. (4.) By sec. 3, ch. 31, Laws of 1873, the attorney general is "authorized and required to institute a suit in the supreme court, by or in the nature of *quo warranto*, in the name of the state of Wisconsin," against the present defendant, to enforce the forfeiture declared by that act. These constitutional and statutory provisions seem to confer ample jurisdiction upon this court over the subject matter. 2. Counsel argued at length that the defendant company had no legal authority to change the terminus of its road from Tomah, and abandon that part of its road between Tomah and Warren's Mills. 3. Independently of the question as to the power of the defendant to make such change and abandonment, a complete case is made for the relief sought, by ch. 31, Laws of 1873, if that act is valid. And the constitution of this state expressly authorizes such legislation. Sec. 1, art. XI, which relates to corporations without banking powers, provides that "all general laws and special acts enacted under the provisions of this section may be altered or repealed . by the legislature at any time after their passage." The charter of the company was granted and accepted subject to this power of the legislature to alter or repeal it at any time. And all the adjudged cases concur that "where an absolute power to alter, annul or repeal acts of incorporation has been reserved by the legislature, the power to repeal is unqualified." 1 Am. Law Rev., 451; *Miller v. The State*, 15 Wall., 478, 488; *Pennsylvania College Cases*, 13 id., 190, 213; *Sherman v. Smith*, 1 Black, 587; *Olcott v. The Supervisors*, 16 Wall., 678, 694; *Agricultural Branch R. R. v. Winchester*, 13 Allen, 29; *Commonwealth v. Eastern R. R. Co.*, 103 Mass., 254; *Nazro v. Merchants' Mut. Ins. Co.*, 14 Wis., 295; *Chapin v. Crusen*, 31 id., 209, 215.

DIXON, C. J. The only point urged in support of the demurrer, and the only question to be considered, is that pertaining to the jurisdiction of the court. The learned counsel for

the defendant argues very ingeniously, and with an industrious presentation of authorities, to show that this court has no jurisdiction of the action when the purpose is to vacate the charter or annul the existence of a private moneyed or commercial corporation. It seems to us that the argument is one of the kind which refutes itself by proving too much. The position of counsel, fairly stated, is, that section 3, art. VII of the constitution confers upon this court jurisdiction only of those cases which in ancient times were remediable by the writ of *quo warranto*, and not of those to which the information in the nature of *quo warranto* had been applied after the writ had fallen into disuse. This is in direct conflict with the decisions of this court in at least three cases, in which substantially the same position was taken and directly overruled. *Attorney General v. Blossom*, 1 Wis., 317; *Attorney General v. Barstow*, 4 id., 567; *State v. Messmore*, 14 id., 115. But, to proceed with the argument of counsel, his view is, that, as the writ of *quo warranto* had never been used to vacate the charter or annul the existence of a private moneyed or commercial corporation, because no such corporation had ever existed before the time the writ fell into disuse or was superseded by the information in the nature of *quo warranto*, therefore this court has no jurisdiction of the information in such case, it being one beyond the purview of the constitution or grant of power contained in it. Counsel argues that although the proceeding in form of information may be adopted, or that by civil action as a substitute, yet that the class or classes of cases over which jurisdiction is conferred upon this court are limited to such as were the proper subjects of the writ of *quo warranto* at the time that writ ceased to be used and the information took the place of it. The argument is founded altogether upon the use of the words " writ of *quo warranto* " in the constitution, instead of the words "information in the nature of *quo warranto*," and, if correct, would take us back for the period of five hundred years or thereabouts to ascertain the class or classes of cases or particular

subjects over which jurisdiction was given or intended by the clause of the constitution under consideration.  It requires but a brief study of the history of this branch of the English law to show the burden assumed by the learned counsel were he to attempt to point out and fix the limits of the jurisdiction thus conferred upon the court; or to show the difficulties by which the court would be surrounded if it were compelled to solve the question and determine the extent of its own powers upon any such view or construction of the constitutional provision.  It will be found that the whole subject is so veiled and hidden in the mists and clouds of antiquity that few courts or authors ever essay to give any explanation of it, and that no living lawyer or student, however versed in ancient law or antiquarian in his legal pursuits and studies, would be competent to unfold the problem or clear up the doubts and uncertainties by which it is on all sides beset.  In the first place it will be learned that it is a point beyond the power of human reach or effort, to ascertain the time when the writ of *quo warranto* fell into disuse, and the information became a substitute for it in all cases.  It can only be known that both are common law proceedings, and were in use at the same time, probably as early and perhaps much earlier than the thirteenth century.  Most writers are entirely silent upon the subject, regarding it as one respecting which elucidation is impracticable or impossible.  The only author whose works have come under our observation and who attempts any explanation of it, is Mr. Tancred, whose learned and instructive treatise on *The Law of · Quo Warranto* was published in London in 1830. In the introduction to his treatise, p. XVI, after having quoted from Bracton, ch. 19, " On Eyres and Franchises," and having shown the three classes of·persons holding franchises liable to be proceeded against, and the three modes of inquiry to be pursued respecting them before the justices in the court of eyre, the author says of the third class, that they " were those who had not made claim, and who had been presented as hold-

ing franchises by the inquest of their bailiwick. *In this last mode we seem to discover the origin of information in nature of a quo warranto.* The use of the presentment in eyre was to bring under the legal cognizance of the justices the fact that a franchise not claimed was held by an individual within their jurisdiction; the same is the office of the presentment, or indictment, or information in the court of King's Bench." The remarks of the author and nature of the proceedings are explained by the context, and the whole subject, as well as the causes which led to the enactment of the statute of *quo warranto*, 18 Edw. I., stat. 2, read by counsel on the argument, are made quite intelligible in Reeve's History of English Law, by Finlason, vol. 2, pp. 126–9, and vol. 1, p. 416 and following. See also Crabb's History of English Law, pp. 174–5.

And again, at page 18, Mr. Tancred says that "the power of the attorney general, and of his deputy, the master of the crown office, in respect to the filing of informations in the nature of *quo warranto*, equally with their powers of filing informations for misdemeanors in general, are derived from the common law." And at page 15, speaking of the erroneous impression that the statute of 9 Anne (A. D. 1711), c. 20, originally conferred power upon the coroner to file such informations, the author observes: "The records of the crown office leave no room to doubt, that informations were filed by the coroner anterior to that statute, even in cases directly within its provisions, which clearly shows that the latter statute did not first introduce these informations, but only made some regulations with respect to the prosecution of them. The act of the 9th of Anne extends only to the cases of individuals usurping offices or franchises in corporations, when the right of the body to act as a corporation is acknowledged; an information against the whole corporation, as a body, to show by what authority they claim to be a corporation, can only be brought by and in the name of the attorney general."

And the same writer's remarks upon the statute, 18 Edward

The State vs. The West Wisconsin Railway Company.

I., passed in the year 1290, are so illustrative of the hopelessness of the mission upon which the learned counsel would send the court in search of its jurisdiction under the constitution, that we are disposed to transcribe them at length as the best comment which can be made. The learned counsel himself only suggests doubts and suspicions respecting the jurisdiction, without pursuing the inquiry or pausing to assist the court out of the tangled web of antiquated precedents and distinctions into which it would inevitably be drawn by adopting his views. It is incumbent on counsel or court accepting such conclusion, to point out at least with some approach to clearness and precision the jurisdiction which the court has, or the class or classes of cases of which it will take cognizance. It is not enough, under such circumstances, to say that the case at bar is not one which was remediable by the writ of *quo warranto*, or to which that remedy was applied in the reign of Edward the First. Some regard must be paid to future cases, and to the condition in which the court will find itself when they shall arise, respecting the all important question of jurisdiction. It is not enough that the court is able to say that there existed no banking, insurance or railway corporations in England during the thirteenth and fourteenth centuries; but the court is, or would be on the theory of counsel, required to go farther, and determine precisely what rights, privileges, franchises and liberties, corporate or otherwise, were examinable and could be adjudicated on the writ at that distant period. But, to return to our author and his remarks, he says: "By the last clause of the STATUTUM DE QUO WARRANTO NOVUM, 18 Edw. I., the king, with a view to spare the costs and expenses of the people of his realm, granted 'that pleas of *quo warranto* should from thenceforth be pleaded and determined in the eyres of the justices; and that the pleas then depending should be readjourned into their own particular shires until the coming of the justices into those parts.' *The precise period of the institution or cessation of the eyres seems unknown.* Lord COKE charges with error *in*

VOL. XXXIV.—14

*fonte et in fine* those who supposed that Henry the Second did first institute the justices in eyre; or that they ceased in the time of Edward the Third. He ascribes to them an indefinite antiquity of origin, and shows that they ceased not at the time stated; for that after the reign of Edward the Third, they are mentioned as well known, and the institution as existing in practice; for it was enacted by act of parliament (in respect of the troubles and foreign affairs), that no eyres should be holden for two years; and at a later period, in 16 R. II. (1393), that no eyre should be holden till the next parliament. One probable reason why it is difficult to ascertain the exact period of the extinction of the eyre, is that its decline was gradual; and the cause of that decline seems reasonably referred, by the same author, to the establishment of justices of assize; for, as their power, by many acts of parliament, and the extent of the numerous commissions with which they were intrusted, increased, so that of the justices itinerant vanished away. Whenever the circuits of the justices in eyre ceased, the above provision in the statute of 18 Edw. I. necessarily lost its effect also; *for, with justices in eyre this branch lived, and with them it died.* The writ of *quo warranto*, therefore, in the same manner as before the passing of the statute, became returnable before the King's Bench, and other courts at Westminster; and the same delays and expensive proceedings which had led to the enactment of the statute of Edward the First, were, it may be presumed, again experienced. Whether such considerations, or the conclusive character of the judgment, which was final even against the crown, *occasioned the disuse of the proceedings upon the writ of quo warranto, and led to the substitution of that which has since prevailed, can now be only matter of conjecture.* By abandoning the civil process and its long train of dilatory steps, and resorting to the criminal form of an information, a more expeditious decision of the suit was secured; and as the investigation, when the proceedings had assumed a criminal character, took place in the county where the franchises were situated, the

object which the legislature had formerly in view was indirectly attained. Whatever the immediate cause of the change, and *whenever it was brought about, the information was made and has been found to answer all the purposes which were effected by the proceedings under the old writ before the eyre.*"

And the observations of Lord COKE (2 Inst., 498, title, STATUTUM DE QUO WARRANTO), referred to by the author and in part quoted, are useful as revealing to some extent the darkness which surrounds the question. He says: " As to the second point, that justices in eyre should cease in the raigne of Edward the Third, they have not onely erred *in fonte*, but *in fine* also, for they ceased not in the raigne of King Edward the Third, for it is enacted by act of parliament after that king's raigne (in respect of the troubles and foreine affaires) that no eyres should be holden for two yeers; and after 16 R. 2, that no eyre should be holden until the next parliament; but thus much in a case so evident shall suffice. We have added thus much, not of curiosity, nor of a spirit of contradiction, but for two respects: the one, that when our historians do meddle with any legall point, or matter concerning the law, we would advise them that they would, before they write, consult with those that be learned and apprised in the laws of this realm; the other, that truth might be manifested and prevail."

Now if so great a luminary of the law and student and expounder of the ancient institutions of his country as Lord Coke, who wrote upwards of two hundred and fifty years ago, was in doubt and could not determine when the justices in eyre ceased, and consequently when the the writ of *quo warranto* fell into disuse (for we are informed that the writ was used only during the continuance of that institution), how is it possible for any court or lawyer to determine the same question at the present day? And if that question can not be determined, how is it possible to determine what pleas of *quo warranto*, or franchises or liberties, were cognizable under the writ at the time it ceased to be used? We might stop here,

and in the words of Lord Coke say; "but thus much in a case so evident shall suffice." It is a manifestly endless as well as fruitless pilgrimage in which counsel would engage the court; and the design of this investigation, since we have come to some preception and knowledge of the subject, has been, "not to let the light in but the darkness out,"— to make the darkness visible.

To accept the views of counsel would therefore be to say that this court has no definite or ascertainable jurisdiction under the grant of power contained in the constitution. The argument disproves itself, therefore, by proving too much; and it would be better, undoubtedly, to adopt the views advocated by counsel in the earlier cases in this court, namely, that the constitution reserved only the power to issue the ancient writ of *quo warranto*, which, as we have seen, *was a civil writ* at the suit of the crown, and ran for lands and tenements as well as franchises and liberties, and in some cases was a mere action for discovery, and was commenced by proclamation as well as by service of process, and which had been obsolete and wholly unknown in the English courts for nearly four hundred years before the constitution was framed. This would dispose of the whole question by showing that no jurisdiction could be exercised; for no lawyer probably could prepare the writ and conduct the proceeding to a successful termination without personal access to the ancient entries in the crown office, which could not well be had.

The futility and unreasonableness of all such interpretations of the constitution are apparent. It is as impossible to believe that the framers of the constitution were looking back over the period of three or four hundred years into the middle ages, designing to give this court such jurisdiction, and only such, as was then exercised in virtue of the writ of *quo warranto*, as it is that they intended to confine the court to that antiquated and useless process. The framers of the constitution were practical men, and were aiming at practical and useful results.

They used the words "*writ of quo warranto*" just as they had been used in common parlance, and by courts, lawyers and writers for hundreds of years, as synonymous with "information in the nature of *quo warranto*," which had so long been the complete and unqualified substitute for the writ. " This (the information).is properly a criminal method of prosecution, · as well to punish the usurper by a fine for the usurpation of the franchise, as to oust him, or seize it for the crown ; but hath long been applied to the mere purposes of trying the civil right, seizing the franchise, or ousting the wrongful possessor ; the fine being nominal only." 3 Black. Com., 263. By the statute of this state the fine may be something more than nominal. R. S., ch. 160, sec. 15 ; 2 Tay. Stats., 1812, § 21. And in the early and leading case in New York, *The People v. Utica Ins. Co.*, decided in 1818, and reported 15 Johns., 358, in which the remedy by information was applied to one of these modern private moneyed or commercial corporations, we find Justice SPENCER using the following language : " An information in the nature of a *quo warranto* is a substitute for that ancient writ which has fallen into disuse ; and the information which has superseded the old writ is defined to be a criminal method of prosecution, as well to punish the usurper by a fine for the usurpation of the franchise, as to oust him, and seize it for the crown. It has for a long time been applied to the mere purpose of trying the civil right, seizing the franchise, or ousting the wrongful possessor, the fine being nominal only. 2 Inst., pl. 12 ; 3 Burr., 1817 ; 4 Term Rep., 381 ; 1 Bulst., 55." Now it was with a view to this well known jurisdiction, then and long before exercised only in the proceeding by information, that the framers of the constitution gave or reserved the power to this court, using for convenience and brevity merely the words " writ of *quo warranto*," just as those words were used by Chancellor KENT in *Attorney General v. Utica Ins. Co.*, 2 Johns. Ch., 371, 376, and as they had been used by other courts and writers times without number, and as they are still

even used in our own statute (R. S., ch. 160, sec. 1; 2 Tay. Stats., 1807, §1 ), as meaning the same thing and intended to convey the same general idea as the words, "information in the nature of *quo warranto.*"

We are aware that a different interpretation has been given to a like clause in the constitution of the state of Arkansas and also of Missouri.   *State v. Ashley*, 1 Ark., 279; *S. C.*, id., 513.    See also *State v. Real Estate Bank*, 5 Ark., 595; *State v. Johnson*, 26 id., 281; *State v. St. Louis Ins. Co.*, 8 Mo., 330; *State v. Stone*, 25 Mo., 555.    The earlier cases in Missouri held the rule which we adopt.    *State v. Merry*, 3 Mo., 278; *State v. McBride*, 4 id., 303.    And such, we think, is the almost universal American doctrine.    See *State v. Gleason*, 12 Fla., 190.  Of the cases still adhering to the distinction between the writ and the information, that first above cited is much the best reasoned and most elaborate; but after a careful perusal of the arguments and the opinion, it seems to us that counsel for the motion, which was overruled, were sustained by much the stronger reasoning.    In Pennsylvania, it appears, that there is a statutory writ of *quo warranto* in many respects resembling the ancient one.    *Commonwealth v. Burrell*, 7 Pa. St., 34.

The main constitutional objection being thus disposed of, if indeed the same was not effectually so by the former decisions of this court, it only remains to consider some minor points and objections adduced by counsel and which were supposed to favor and give greater force to this main one.

The eighteenth section of the statute regulating proceedings in *quo warranto* (R. S., ch. 150; 2 Tay. Stats., 1812, § 24), provides that when judgment of forfeiture or dissolution shall be rendered against a corporation, "the court shall have the same power to restrain the corporation, to appoint a receiver of its property, and to take an account, and make distribution thereof among its creditors, as are given by law."    It is objected that this provision, so far as it is applied or intended to be to this court, is wholly invalid, because under the constitution no

original equity jurisdiction, except to issue the writ of injunction, is or can be conferred upon this court. We are not disposed to take issue with counsel upon this point, though several years ago jurisdiction was in fact assumed under this clause, and receivers appointed, and the property and assets of several disfranchised and dissolved banking corporations distributed by judgment of this court. This was done without the point being brought to the attention of the court; and when afterwards a motion was made to set aside one of those judgments for want of jurisdiction, the course of decision and opinion pronounced by the court was such as to indicate very clearly that it was considered by the judges to have been error to assume the jurisdiction in the first place. *State of Wisconsin v. Waupaca Co. Bank*, 20 Wis., 640.

Assuming, and we concede, that this original equitable power cannot be conferred upon this court, counsel argues against its jurisdiction to pronounce judgment of disfranchisement or forfeiture, because of the most unhappy and disastrous consequences which he thinks must follow to the creditors and stockholders of the corporation. Counsel supposes, upon the rendition of judgment of dissolution or of forfeiture or ouster, without original equitable power in this court to appoint a receiver, and take an account, and make distribution of the property among creditors and stockholders, that the personal property of the corporation will all go to the state, and the real revert to the original owners, according to the ancient rule of the common law. He also argues that this would be in contravention of the constitution of the United States, as violating the obligation of contracts. If it were possible for any such results to follow in this state, it will be found that this court would fully agree with counsel upon the constitutional question, by referring merely to the case of *Whiting v. R. R. Co.*, 25 Wis., 206, where the same authorities are cited which are relied upon by counsel.

But the apprehensions of counsel are wholly unfounded, and

the evils he anticipates purely imaginary. All have been fore-
seen and provided against by the legislature as fully and
amply as in any of those states to whose statutes counsel re-
ferred; and the time never was in this state or territory when
any such results could follow. To show that there can be no
mistake about this, we quote the statutes now found as secs. 8
and 9, ch. 78, R. S. 1858 (1 Tay. Stats., 1028, §§ 8, 9), as fol-
lows: Section 8. "All corporations whose charters shall expire
by their own limitation, or shall be annulled by forfeiture or
otherwise, shall nevertheless continue to be bodies corporate
for the term of three years after the time when they shall have
been so dissolved, for the purpose of prosecuting or defending
actions by or against them, and of enabling them gradually to
settle and close their concerns, to dispose of and convey their
property, and to divide their capital stock, but not for the pur-
pose of continuing the business for which such corporations
may have been or may be established." Section 9. "When
the charter of any corporation shall expire or be annulled, as
provided in the preceding section, the circuit court of the
county in which such corporation carries on its business, or has
its principal place of business, on application of any creditor of
such corporation, or of any stockholder or member thereof, at
any time within said three years, may appoint one or more per-
sons to be receivers or trustees for such corporations, to take
charge of the estate and effects thereof, and to collect the debts
and property due and belonging to the corporation, with the
same powers, and who shall perform the same duties, as receiv-
ers appointed as provided by law upon the voluntary dissolu-
tion of corporations; and the power of such receivers may be
continued beyond the said three years, and as long as the court
shall think necessary." The same provisions were contained
in the revised statutes of 1849, and prior thereto in the territo-
rial statutes of 1839. R. S. 1849, ch. 54, secs. 8, 9; Statutes
1839, p. 146, §§ 2, 3. In view of these statutory provisions,
therefore, these last named objections of counsel vanish, and

there remains nothing in the way of the full exercise of its jurisdiction by this court, unless it shall be found that another point taken by counsel is insuperable.

It is urged that the remedy by *mandamus* would be proper to compel the defendant to relay its track. If it be granted that such writ would lie, yet it is not seen why it is not equally a violation of its charter, or of the law which the company is bound to obey, for it to refuse to restore the track and run its trains, even though no *mandamus* be applied for. If we say nothing about the special remedy by *quo warranto* which the attorney general was authorized and required to use by chapter 31, Laws of 1873, and which he has or might have employed in this case, there still exists the general law, several of the provisions of which are directly applicable to and will sustain this action. R. S., ch. 160, sec. 4, subds. 1, 2, 4; 2 Tay. Stats., 1808, § 8. It is not perceived, therefore, how the jurisdiction of the court can be affected because there may exist some other remedy to compel a performance of the act, the omission to perform which is complained of and shown to be a violation of the charter of the company, or an abuse of its privileges which the law declares shall work a forfeiture.

*By the Court.* — Demurrer overruled.