# STATE OF UTAH EX REL. BENJAMIN T. LLOYD
## v. WILLIAM M. ELLIOTT.

QUO WARRANTO—JURISDICTION OF SUPREME COURT—WHEN EXER-
CISED.

1. On application for leave to file in the supreme court an informa-
tion in the nature of *quo warranto*, it appeared that the
relator, Benjamin T. Lloyd, was appointed to fill an unex-
pired term in the city council of Salt Lake City of one
Joseph M. Watson, who, before his death, had been re-elected
to the same position.  The relator claimed the right, under
his appointment, to succeed Watson, not only for the unex-
pired term, but also for the term to which Watson had been
elected, but for which Watson had not qualified at the time
of his death.  *H.ld*, that the constitutional grant to issue
writs of *quo warranto* confers upon the supreme court juris-
diction to proceed by information in the nature of *quo war-
ranto*.  The government officer has the right, *ex officio*, where
the proceedings are instituted without any relator, to file an
information, as of course, without leave of court; but he
cannot prevent the court from assuming jurisdiction, by
refusing to consent to the use of his name, when a private
citizen is the relator.  When it is sought to file an informa-
tion on the relation of a private person, the better practice,
where, as in this state, the statutes do not otherwise direct,
is to apply to the court, by petition or motion supported by
affidavits, for a rule on the defendant to show cause why
the information should not be filed.

2. The supreme court of the state was intended by the constitu-
tion to be a court of appeal, and will, therefore not assume
jurisdiction under the grant contained in section 4, art. 8 of
the constitution, in cases of writs of *quo warranto*, at the
relation of a private person, except in cases which present
sent some special reason or some special or peculiar emer-
gency, or where the interests of the state at large are shown
to be such as to render it apparent that the interests of
justice require its exercise.

3. Where, as in this case, the appellate court of the state, and inferior courts of general common-law powers, are vested with jurisdiction in *quo warranto*, the appellate court may properly refuse to assume jurisdiction in matters where the inferior courts have ample power, and can, by entertaining the information, afford adequate relief; and the right of the appellate court to exercise its discretion in granting or withholding leave to file an information in the nature of *quo warranto* is not limited, nor is the discretionary power of the court exhausted until it has permitted the information to be filed.

(No. 698.   Decided March 28th, 1896.   44 P. R. 248.)

Application by the state, by Charles O. Whittemore, county attorney for Salt Lake county, on the relation of Benjamin T. Lloyd, for a writ of *quo warranto* against William M. Elliott.   *Petition denied.*

No brief was filed in this case.

BARTCH, J.:

This is an application for leave to file in this court an information in the nature of *quo warranto*, at the relation of a private person.   The information states that at the election in November, 1893, one Joseph M. Watson was elected to the office of councilman of Salt Lake City, and thereafter qualified, entered upon, and discharged the duties of the office, until his death, which occurred on the 14th day of December, 1895; that previous to his death, at the election held in November, 1895, he was again elected to the same office for another term of two years, to commence on the 1st day of January, 1896; that on the 17th day of December, 1895, the city council, of which said Watson had been a member, appointed the relator to fill the vacancy occasioned by the death of said Watson; that the relator qualified, and entered upon the discharge of his duties, and continued in the discharge of the same

until the 2d day of January, 1896, when the said council refused to recognize him as councilman, or to allow him to exercise any rights or privileges as such, and thereafter, on the 7th day of January, 1896, appointed the defendant to the office in place of the relator; and that the defendant thereupon unlawfully usurped said office. Other facts are stated, with considerable minuteness, to show that the relator is entitled to hold and exercise the duties of the office, and that the defendant is an intruder, and wrongfully withholds the same. The information then concludes with an averment that although the defendant's appointment was void, there being no vacancy, yet he refused, and still refuses, to surrender the office to the relator, and still continues to hold and usurp the same, to the exclusion of the relator and against his will. Such are the facts as they appear from the face of the petition, and as we were called upon to assume jurisdiction in like proceedings on a former occasion, in *State* v. *Young*, and as other similar cases will doubtless follow, it behooves us to determine to what extent this court has original jurisdiction, and, as near as may be, under what circumstances we will exercise it, and whether the circumstances indicated by the facts alleged in the petition in this case, are such as will move this court to interpose its authority, assuming that it has jurisdiction.

The constitution of this state, in article 8, § 4, among other things, provides: "The supreme court shall have original jurisdiction to issue writs of *mandamus, certiorari,* prohibition, *quo warranto,* and *habeas corpus.*" It has been insisted, however, by some of the counsel, in their arguments before this court (especially in *State* v. *Young*, where the question of jurisdiction was raised by demurrer to the petition, and which demurrer was overruled in an oral opinion), that the authority conferred is limited to the ancient use of the writ of *quo warranto* proceedings,

and that the power can only be exercised when the state is concerned, at the instance of the attorney general, and not at the relation of a private person. This position is doubtless the result of the changes in the form of the writ, as shown by its history, and of a confusion of the principles governing the jurisdiction under discussion, as well as to a want of proper appreciation of the meaning of the term "*quo warranto*," in its ancient and original use, and its use in modern and American parlance, respecting the results designed by these proceedings. The ancient writ of *quo warranto* was a high prerogative writ. Its origin is so hidden in antiquity that no courts or law writers have yet attempted to state the exact time when it first came into use. It is, however, known that it was a common-law proceeding, and was probably used in the twelfth century, about the time of Richard I. (A. D. 1198.) It was a civil remedy, in the nature of a writ of right, for the king, against any one who claimed or usurped any office, franchise, or liberty, to inquire by what authority he supported his claim, in order to determine the right. It was also issued in the case of non-user or misuser of a franchise, and commanded the defendant to show by what warrant he exercised it; having had no grant of it, or having forfeited it by neglect or abuse. Originally the writ issued out of chancery, and the sheriff was commanded to summon the defendant to appear before the king's justices at Westminster; but afterwards, under the statute of *quo warranto* (6 Edw. I. A. D. 1278, and 18 Edw. I. A. D. 1290), the writ was returnable before the justices in eyre, and, after those justices gave place to the king's justices on the several circuits, the writ was again prosecuted before the justices at Westminster. If the defendant failed to establish his right to the franchise, judgment was given for the king, and the franchise was seized for the king, if it was such as subsisted in the

hands of the crown. If not, then there was merely a judgment of ouster. The judgment on the writ (being a writ of right) was conclusive, even on the crown. 3 Bl. Comm. 262; High, Extr. Rem. § 592. The length of the process in *quo warranto*, together with the discontinuance of the justices in eyre, probably caused the introduction of the more modern and speedier remedy, by information in the nature of *quo warranto*, and occasioned the disuse into which the ancient writ has fallen. The information was a criminal process, and, in the event the defendant failed to establish a right to the franchise, warranted not only a judgment of seizure for the crown, or ouster, but also the imposition of a fine, as a punishment for the usurpation; the fine, however, being nominal only. The information was filed by the attorney general in the court of the king's bench, and no controversies could be determined by the use of the writ of *quo warranto*, or by information in the nature of *quo warranto*, except such as existed between the crown and its subjects. The writ could not issue, nor the information be filed, at the relation of a private subject; and it appears there was no material change in the proceeding until, by the statute of 9 Anne, c. 20 (A. D. 1710), the province of the information was greatly enlarged. That statute permitted an information in the nature of *quo warranto* to be brought, at the relation of a private person, with leave of court, against any person who unlawfully held or usurped any office or franchise, and provided for judgment of ouster to follow conviction, and that the relator should pay or receive costs, according to the event of the suit. 3 Bl. Comm. 263, 264. The information was strictly a prerogative remedy prior to the passage of the statute of 9 Anne, and resembled the ancient writ of *quo warranto*, in that it was used to punish a usurpation of the privileges of the king; and, as has been stated, the proceeding was

instituted by the attorney general, without leave of court. By virtue of the statute the machinery of the crown is put in motion at the relation of a private person.  The name of the government's officer is used, because the public, as well as the relator, is supposed to have an interest in the proceeding; and leave of court is required to file the information, to prevent imposition upon the government and interference by evil-disposed persons.  The information is criminal in form, but, in substance, it has long since been regarded as a civil proceeding for the correction of the usurpation, nonuser, or misuser of a public office or corporate franchise; and as now employed, both in England and America, its object is substantially the same as that of the ancient writ of *quo warranto*.  It has entirely superseded the ancient writ in England, and in most of the states of the union.  High, Extr. Rem. §§ 591, 601.

It may thus be observed, from an examination of the origin and nature of the writ of *quo warranto*, and of the information in the nature of *quo warranto*, that both were high prerogative writs; that both were employed to obtain the same ultimate result, viz., to test the right of the defendant to the office or franchise; and that prior to the statute of 9 Anne the title to a public office of franchise could be tested only at the instance of the king, by his attorney general.  The former was a tedious process; the latter, a more convenient, enlarged, and speedy remedy.  The former fell into disuse; the latter became substituted for it.  High, Extr. Rem. § 600.  The expression "writ of *quo warranto*" is a short and more convenient term than the cumbersome "information in the nature of *quo warranto*."  It can therefore readily be understood why legislators, courts, and law writers say *"quo warranto"* when they mean "information in the nature of *quo warranto*;" and such we think is the meaning of the words

"*quo warranto*," as used in our constitution. Any other interpretation would do violence to their known meaning, as used in common parlance in the United States. It would be unreasonable to assume that the framers of our constitution, regardless of the meaning attributed to the term "writ of *quo warranto*" in this country, looked back through the centuries, into the middle ages, designing to confer upon this court such jurisdiction, and such only, as was exercised by the courts of Westminster and king's bench under the prerogative of the crown, no matter how enlarged the use of the writ had become, through the process of time and the requirements of justice. No such meaning was intended. The constitution was framed by practical men, who aimed at useful and practical results, without reference to any process which has long ago fallen into disuse, even in the country of its origin. The term was not used by them in a restricted sense, but in the same sense in which it has been used for several hundred years both in England and in this country. In fact, it has been decided by some of the courts in the United States that "*quo warranto*" and "information in the nature of "*quo warranto*" are synonymous terms. High, Extr. Rem. § 610; *State* v. *West Wisconsin Ry. Co.*, 34 Wis. 197; *State* v. *Gleason,* 12 Fla. 190; *People* v. *Rensselaer & S. R. Co.*, 30 Am. Dec. 33, 46. We hold, therefore, that the constitutional grant to issue writs of *quo warranto* confers upon this court jurisdiction to proceed by information in the nature of *quo warranto.* Except when changed by statute, the rule of procedure is practically the same in this country as in England. The government officer has the right, *ex officio*, where the proceedings are instituted without any relator, to file an information as of course, without leave of court; but he cannot prevent the court from assuming jurisdiction by refusing to consent to the use of his name when a private citizen is the relator.

When it is sought to file an information on the relation of a private person, the better practice, where, as in this State, the statutes do not otherwise direct, is to apply to the court, by petition or motion supported by affidavits, for a rule on the defendant to show cause why the information should not be filed. It seems, in the early practice, the courts granted leave to file the information as a matter of course, but the growing frequency of the applications rendered it necessary to exericse discretion in the premises; and the rule is now well settled that the granting of permission to file an information at the relation of a private person rests in the sound discretion of the court to which application is made. And this is so even when substantial objection to the title of the person whose right is questioned is shown. High, Extr, Rem. §§ 605, 611, 707; *Rex* v. *Parry,* 6 Adol. & E. 810; *People* v. *Waite,* 70 Ill. 25; *Com.* v. *Arrison,* 15 Serg. & R. 127; *State* v. *Tolan,* 33 N. J. Law, 195; *People* v. *Richardson,* 4 Cow. 97, 102; *Com.* v. *Walter,* 83 Pa. St. 105; *State* v. *Vail,* 53 Mo. 97.

In the United States the remedy by information in the nature of *quo warranto* has been so enlarged that courts will, under this proceeding, inquire not only by what authority the defendant assumes to exercise the functions of a public office, but will also, when necessary, inquire into the rights of the relator to hold the office, and will finally determine all disputed questions of title to the same. For this purpose it is especially applicable in this country, because, under our American system of government, the people constitute the sovereignty. They are the source of all power, and the title to office is derived from them; and, the tenure of office being generally of short duration, it is entirely in harmony with justice that questions affecting the right to exercise the functions and receive the emoluments of a public office

should be determined by convenient and speedy proceedings, and it seems that the information is used more to settle disputed questions of title to office in this country than for any other purpose. The supreme court, under the grant contained in the constitution, has power to, and will, apply this enlarged remedy to every case of which it may entertain jurisdiction, when the controversy is such that a complete determination thereof will demand it. This, it is apprehended, was the design of the framers of our fundamental law, which is the will of the sovereignty itself, and it was doubtless not so much the particular form of proceeding as the practical results to be obtained that occasioned the employment of the term *"quo warranto."* "Whether resort be had to the ancient writ of *quo warranto,* or any process analogous thereto, or to the more modern and convenient remedy by information, the object of the proceeding is substan·tially the same, viz., to correct the usurpation, nonuser, or misuser, of a public office or of a corporate franchise. And it is doubtless due to the comparatively short tenure of most offices in this country, as well as to the method of popular elections which form the distinctive feature of the American system, that the jurisdiction is more frequently invoked for the determination of disputed questions of title to public offices in this country than for all other causes combined." High, Extr. Rem. § 609; *State* v. *West Wisconsin Ry. Co.,* 34 Wis. 197; *State* v. *Cunningham,* 83 Wis. 90, 53 N. W. 35; *Union Pac. Ry. Co.* v. *Hall,* 91 U. S. 343, 355; *Attorney General* v. *Boston,* 123 Mass. 460.

Although invested with original jurisdiction, is this case one in which the court ought to exercise it? There is no claim of any special reason or of any peculiar emergency which should induce the court to assume jurisdiction. Nor is this a case where the State has a special

interest, or in which the relator has no speedy and convenient remedy in any other tribunal; for, under the constitution, the district courts also have jurisdiction in *quo warranto*. Section 7 of the article above mentioned provides, so far as material here, as follows: "The district courts, or any judge threof, shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* prohibition and other writs necessary to carry into effect their orders, judgments and decrees, and to give them a general control over inferior courts and tribunals within their respective jurisdictions." This section empowers the district courts to issue all the writs of which the supreme court has jurisdiction by virtue of section 4; and, construing the two sections together, the intent to give the supreme court and district courts the same original jurisdiction to issue the writs mentioned in section 4 is manifest. The district courts are given "general control over inferior courts and tribunals within their respective juisdictions." Ample power is vested in them to afford adequate relief to the parties in this case. In fact, the controversy can be determined in a district court more conveniently than it can be in this court, because it necessarily involves questions of fact, which it is the special province of the district court to determine, and which we have no proper facility to try. It will be noticed that there are five writs of which the supreme court has original jurisdiction, and very probably many controversies will arise for which one or the other of those writs will afford a proper remedy. Hence, if were to assume jurisdiction of every such controversy which might be brought before us, regardless of whether the State had a special interest therein, or whether it presented any special exigency, it can readily be perceived that much of our time would be consumed

13 UTAH—14

in hearing and determining cases which could more speedily and conveniently be heard and determined in an inferior court. This would seriously impair the usefulness of this tribunal as an appellate court, and yet its appellate power was the main object of its creation. No construction which would render such a result possible is warranted by the provisions of the constitution relating to the judicial department. From the general policy indicated, and the language used, it is manifest that this tribunal was intended by the framers of the constitution to be essentially a court of appeals; and therefore we will not assume jurisdiction, under the grant contained in section 4, at the relation of private parties, except in cases which present some special reason or some special or peculiar emergency, or where the interests of the State at large are shown to be such as to render it apparent that the interests of justice require its exercise. The remedy provided by the constitution, authorizing proceedings in inferior tribunals, must in all cases be followed, unless it shall be made to appear, to the satisfaction of this court, that there is an urgent necessity for the interposition of its power. Where, as in this case, the appellate court of the State and inferior courts of general common-law powers are vested with jurisdiction in *quo warranto*, the appellate court may properly refuse to assume original jurisdiction in matters where the inferior courts have ample power, and can, by entertaining the information, afford adequate relief; and the right of the appellate court to exercise its discretion in granting or withholding leave to file an information in the nature of *quo warranto* is not limited. Nor is the discretionary power of the court exhausted until it has permitted the information to be filed. High, Extr. Rem. §§ 606, 608, 616; Spell. Extr. Rel. § 1777; *State* v. *Buskirk*, 43 Mo. 111; *Wheeler* v. *Irrigation Co.*, 9 Colo. 248, 11 Pac.

103; *State* v. *Claggett,* 73 Mo. 388; *State* v. *Stewart,* 32 Mo. 379; *Coon* v. *Attorney General,* 42 Mich. 65, 3 N. W. 258; 19 Am. & Eng. Enc. Law, p. 664.

In the case at bar the facts stated in the information show that this is a mere contest between private persons for the same office, and we see nothing of such an exceptional character in the circumstances as ought to invoke the interposition of this court. The relator must be referred to his remedy in the district courts. The application for leave to file the information in this court is denied.

ZANE, C. J., and MINER, J., concur.