STATE, *ex rel.* CARY D. LANDIS, Atty. Gen'l, JOHN KILGORE and JOHN A. GARDNER v. S. H. KRESS & Co.

155 So. 823.
Opinion Filed June 8, 1934.

190

*Cary D. Landis,* Attorney General, *Robert H. Givens, Jr.,* and *Edwin Brobston,* for Co-relators;

*Knight, Thompson & Turner, A. G. Turner* and *George C. Bedell,* for Respondent.

ELLIS, J.—An information in the nature of quo warranto was filed in this Court, September, 1933. Its purpose was to obtain an order to oust S. H. Kress & Company, a foreign corporation organized and existing under the laws of the State of Texas, from its permit to do business in the State of Florida. A writ of quo warranto was issued requiring respondent to show cause why it should not be ousted of its permit to do business in Florida. By stipulation entered into between counsel for the respondent and the Attorney General and counsel appearing for certain persons named in the information as co-relators, an amended information was filed in October.

It appears from the information that S. H. Kress & Company is a Texas corporation and has its principal place of business in New York City; that it obtained a permit to

do business in this State in September, 1927. It is one of a group of several corporations consisting of S. H. Kress & Company, a New York corporation, another by the same name created by and existing under the laws of California, another by the same name created in Colorado, and respondent, the Texas corporation.

The respondent owns and operates eleven stores in Florida, one of which is located in Key West. Respondent sells "hundreds of articles of merchandise, including toilet articles, notions, novelties, hardware, stationery, office supplies, confectionery and clothes." They are sold in competition with "independent merchants of the State of Florida," one of which is John A. Gardner named as co-relator, who conducts a business known as "Gardner's Pharmacy" in which he sells "drug and medical supplies, toilet articles, stationery and sundry other articles."

The group of Kress corporations operate in many cities of the United States and as the "co-relators are reliably informed and believe and therefore aver" there are two hundred and thirty such stores in "which merchandise is sold to the American public in the approximate sum of One Hundred Million Dollars ($100,000,000.00) annually."

The information alleges that the respondent is "engaged in a combination of capital, skill and acts" with the S. H. Kress & Company corporation of New York and other corporations and with the officers and agents of such corporations "for the purpose of creating and carrying out restrictions in the full and free pursuit of businesses authorized and permitted by the laws of the State of Florida."

Those businesses are described in the petition as the "businesses of retail and wholesale merchandising" of the articles above described.

On the information of the co-relators it is alleged the

Kress New York corporations owns the "entire capital stock of said corporation, as well as the entire capital stock of the California and Colorado corporations." The information, by way of argument, alleges that the "combination" exists because of the reliable information coming to co-relators that the New York corporation owns the entire capital stock of the other three Kress corporations" and by reason of the fact that three of the principal officers of said Texas corporation are also officers of the New York corporation" and "by reason of the fact that S. H. Kress & Company, a New York corporation, owned and operated most of the stores now owned and operated by the respondent in the State of Florida prior to the 10th day of September, A. D. 1927, on which date the New York corporation withdrew from the State of Florida, and on which date the Texas corporation began doing business in Florida."

. It is alleged that as a "part of said combination and in pursuance thereof" the Texas Corporation has from that date "created and carried out restrictions in full and free pursuit of businesses authorized and permitted by the laws of the State of Florida."

The information alleges an incident occurring in the City of Tampa to show the effect of the alleged combination upon lawful trade. The incident was the sale by the Kress Store of a *"Greystone Tea Kettle No. 70"* for thirty-five cents which could not be purchased by a retail merchant in the city at the date of the sale for less than seven dollars and ninety cents per dozen, and which "could not be sold profitably by any retail merchant in said City on said date for less than *80c* each." It is also alleged that other articles of merchandise were sold by the respondent at about the same time at prices below the prices at which independent merchants were "able to retail said goods."

The remainder of the information sets up another and different attack upon the respondent. It alleges that the "combination" alleged to exist has great financial resources of which it avails itself in the matter of purchasing articles of merchandise for sale and distribution; that it is enabled to obtain large quantities of merchandise and dispose of it at prices with which independent merchants cannot compete; that the combination operates at a less overhead expense, employs what is known as the "direct to consumer" method of merchandising and thus eliminates "wholesale" merchandising of the articles sold; that by reason of that method of merchandising, made possible by the large resources of the "combination" and its system of doing business, many independent merchants in the State have been unable to successfully compete with the stores of the respondent and have in consequence sustained financial loss and many have been required to suspend business, and employees and merchants have found "difficulty in securing employment." It is alleged that by reason of that method employed "brokers, common carriers, hotels, restaurants, artisans and professional men have lost business and sustained financial loss and have found it necessary to curtail their business and reduce their number of employees."

The information concludes with two propositions of law alleged to be applicable. First that the respondent is exercising its permit to do business in Florida in violation of the anti-trust laws of the State; second, that the Act of the Legislature under which the respondent obtained a permit as a corporation to do business in this State is unconstitutional and void in its application to the respondent because it operates to permit "intercorporate relations as have been alleged" to exist in the information to the detriment of the public welfare in contravention to the preamble of the Con-

stitution of Florida in which it is declared that the "Constitution was ordained to insure domestic tranquility and the public welfare."

A demurrer to the information and motion to quash it were interposed by respondent.

The information is filed in the name of the State on relation of the Attorney General and "John Kilgore, trading and doing business as The State (a newspaper) and John A. Gardner, trading and doing business as Gardner's Pharmacy, by their undersigned attorneys, and on behalf of themselves and independent merchants and citizens of Florida similarly situated and affected."

In the case of State of Florida by W. H. Ellis, Attorney General, *et al.,* v. Bryan and others as the State Board of Control, 50 Fla. 293, 39 South. Rep. 929, this Court said that "Under the laws of this State, the Attorney General is as much the representative of the State of Florida in the Supreme Court, as the King's Attorney General is his representative in the Court of King's Bench; indeed, more so, as in the Court of King's Bench there are for certain causes representatives of the King other than the Attorney General; while here, it is his sole duty to 'appear in and attend to, in behalf of the State, all suits or prosecutions, civil or criminal, or in equity, in which the State may be a party, or in anywise interested, in the Supreme Court of this State'"; that the office of Attorney General is in many respects judicial in character and he is clothed with a considerable discretion; that "Upon the Attorney General, then, rests the responsibility for the filing of this information, for its form, nature and contents, including all of its allegations. The authority and responsibility so vested in him cannot be delegated by him to any person or persons, or even cast upon this Court."

The Court then proceeded to treat the information as brought in the name of the Attorney General, though in a somewhat informal manner, "considering the mention of the so-styled relators as mere surplusage and in no way affecting the validity of the information, nor in any way affecting the absolute control of the case by the Attorney General in his official capacity."

That action was begun by an information in the nature of quo warranto to vest the validity of Chapter 5384, Laws of 1905, and the right of certain persons to be known as the Board of Control and to function as the Act directed.

In the light of that decision the naming of other persons and the inclusion generally of unnamed persons supposed to be affected by the operation of the alleged combination of corporations was merely surplusage having no added influence, conveying no additional power upon the Attorney General and in no wise transferring his responsibility for the institution, management and control of the case.

The material allegations of the information, therefore, many of which are made on information and belief of the "so-styled" co-relators, we treat as made on authority of the Attorney General and in his name and for the purposes of the issuing of the writ must be taken as true, if indeed in such cases any allegations of fact are necessary at all to be made.

Respondent obtained from the State a permit to do business in this State as a foreign corporation under the provisions of Chapter 5717, Laws of Florida, 1907, in September, 1927. The Act was amended by Chapter 13640, Acts of 1929, Sections 6026-7, C. G. L., 1927. The first section of Chapter 5717, *supra*, Section 6026, C. G. L., was amended by Chapter 6876, Laws of Florida, 1915.

In the brief of relator it is stated that it is not necessary

to declare the above named statutes to be void as being in conflict with the Constitution, but that they do not authorize corporations engaged in such methods of doing business as are charged in the information against the respondent. In other words, the foreign-corporations-permit statutes do not contemplate the granting of permits to foreign corporations to do business in this State when such corporations engage in such business methods as are charged against the respondent or when they engage in combinations in restraint of trade in violation of the anti-trust statute.

If the action taken by the Attorney General is construed to be an attack upon the constitutionality of the foreign-corporations-permit statutes we hold that it is within his power as the judicial officer of the Executive Department to do so.

If the power exists, it is not a question of right in him to institute the necessary proceeding when in his opinion a condition exists which requires the exercise of the power. It is a matter of duty. If it were merely a right which he may exercise he would not be amenable to the charge of nonfeasance for not performing the act. A right implies liberty of choice. It would be a privilege vested in him by law to act or forebear action, which would be intolerable in a government constituted as ours because it is the obligation of officials in the public service to perform those acts which the law requires to be performed, not to choose whether they will or not perform them. We have not yet arrived at the point in our complex and varied social conditions so frequently referred to as to justification of anomalous conduct in legislative, judicial and executive functioning where we may with propriety refer to the divine right of our official servants.

The attack by the Attorney General upon the constitu-

tionality of the Act is within the powers of that office, and was so recognized in State, *ex rel.* Ellis, Attorney General, v. Bryan, *et al., supra.*

There is nothing in the decision or opinion of the case of State, *ex rel.* A. C. L. R. R. Co. v. Board of Equalizers, 84 Fla. 592, 94 South. Rep. 681, which contravenes this view. No duty is imposed upon the Attorney General by the act under consideration. He does not have to decide whether the act is valid or not before he is called upon to discharge a duty under its provisions. The decision may apply to the Secretary of State whose duty under the Act is to issue a certificate or permit to the foreign corporation applying for permission to do business in this State but not to the Attorney General who' is required to perform no duty under its provisions. That principle was followed in State, *ex rel.* Indian River Control Dist. v. Board County Com'rs, 103 Fla. 946, 138 South. Rep. 625.

The rule that a person may not attack the constitutionality of an Act of the Legislature whose "right" it does not affect and who has therefore no interest in defeating it applies to private persons. The case of State, *ex rel.* Clarkson v. *Phillips,* 70 Fla. 340, 70 South. Rep. 367, as well as the case of Stinson v. State, 63 Fla. 42, 58 South. Rep. 722, referred to in the Phillips case, *supra,* were each cases in which private persons attacked the validity of an Act which did not affect their rights.

The office of Attorney General has existed both in this country and in England for a great while. The office is vested by the common law with a great variety of duties in the administration of the government. It has been asserted that the duties of such an office are so numerous and varied that it has not been the policy of the Legislature of the States to specifically enumerate them; that a grant to the

office of some powers by statute does not deprive the Attorney General of those belonging to the office under the common law. The Attorney General has the power and it is his duty among the many devolving upon him by the common law to prosecute all actions necessary for the protection and defense of the property and revenues of the State; to represent the State in all criminal cases before the appellate court; by proper proceedings to revoke and annul grants made by the State improperly or when forfeited by the grantee; by writ of quo warranto to determine the right of any one who claims or usurps any office, and to vacate the charter or annul the existence of a corporation for violations of its charter or for omitting to exercise its corporate powers; to enforce trusts and prevent public nuisances and abuse of trust powers. As the chief law officer of the State, it is his duty, in the absence of express legislative restrictions to the contrary, to exercise all such power and authority as public interests may require from time to time. See State, *ex rel.* Young v. Robinson, 101 Minn. 277, 112 N. W. Rep. 269, 20 L. R. A. (N. S.) 1127; 6 C. J. 809; State, *ex rel.* Young v. Village of Kent, 95 Minn. 255, 104 N. W. Rep. 984, 1 L. R. A. (N. S.) 826.

The information in this case was filed by the Attorney General by virtue of the inherent authority of his office. No leave of this Court to file the information was required. The mention of co-relators was surplusage and does not affect the validity of the information. The facts existing in his opinion which call for a quo warranto information, the power and authority exists in him to present it without leave asked of any one. In that respect he represents the sovereignty whose attorney he is. See Vanatta v. Delaware & Bound Brook R. R. Co., 38 N. J. L. 282, text 286; State v. Gleason, 12 Fla. 190.

Having that power and discharging that duty he may take all subsequent and necessary steps to have the case thus instituted passed upon and determined. The information having been filed and the writ issued as of course to the respondent to show cause why it should not be ousted of its privilege to do business in Florida as a foreign corporation by reason of its alleged violation of the provisions of the anti-trust statute of this State and the preamble of the Constitution of the State, there is nothing for this Court to do but to determine the issues of law and fact upon the merits as in ordinary proceedings. See State, *ex rel.* Heatherly v. Shank, 36 W. Va. 223, text 230, 14 S. E. Rep. 1001; People, *ex rel.* Swigert v. The Golden Rule, 114 Ill. 34, text 45, 28 N. E. Rep. 383; High on Extra Legal Remedies, Sec. 606.

The merits are presented by pleas or answers in which a high degree of certainty is required and the right of trial by jury on issues purely of fact is guaranteed by the Constitution. See Buckham v. State, 34 Fla. 48, 15 South. Rep. 697; Van Dorn v. State, 34 Fla. 62, 15 South. Rep. 701; State, *ex rel.* Weeks v. Day, 14 Fla. 9; State, *ex rel.* Smith v. Anderson, 26 Fla. 240, 8 South. Rep. 1.

The rule authorizing the filing of an information in the nature of quo warranto by the Attorney General in his official capacity and without a co-relator and authorizing the issuing of the writ as a matter of right in such cases is generally recognized. The State through her Attorney General applies for the writ. It is the sovereign power requiring a writ to be issued to persons occupying special positions or exercising special powers or privileges.

It is not to be presumed that the law officer of the State would apply for this high pregorative writ for personal or private ends. If he abuses his power or seeks by such use

of it to advance personal or selfish ends he is responsible to the people at the trial for their ballots, or to their representatives in the Legislature, but it does not lie within the power of the Court to question his motives. In this proceeding he is supposed to be impartial and to seek only the vindication of the rights of the State.

When he assumed the responsibility of applying for the writ, which he does when he asks for it in a case like this, he does not transfer any part of that responsibility, nor take to himself any measure of justification for his act, nor add one jot or tittle to his power or lessen in any degree the measure of his duty by naming private persons as "so-styled" co-relators, nor may he with propriety abandon the management of the case to other counsel appearing for the alleged co-relators. Nor in such cases is it necessary for the Attorney General to set out in his information with that degree of certainty required in an indictment or declaration the ultimate facts on which he relies to oust the relator of the franchises, powers or privileges alleged to be usurped or exercised in contravention of law. He becomes the voice of the sovereign power in demanding that the respondent show why it should not be ousted from its franchise. In short, the writ is one of right which the sovereign power demands through the medium of its chief law officer, requiring the respondent to show why it should not be shorn of its powers.

The responsibility is a great one. It is supposed to be vested with discretion and in confidence that it will not be used to harass and annoy persons against whom it may be directed nor used for personal and selfish ends. So the rule is to issue the writ as applied for in the first instance and put the respondent to a showing by plea or answer why it should not be ousted of its alleged usurped powers. See

Com. *Ex rel.* Atty. Gen. v. Walter, 83 Pa. 105, 24 Am. Rep. 154; State, *ex rel.* Walker v. Equitable Loan & Investment Association, 142 Mo. 325, 418, W. Rep. 916; Atty. Gen. v. Sullivan, 163 Mass. 446, text 448, 40 N. E. Rep. 843, 28 L. R. A. 455; People, *ex rel.* Jerome v. State University, 24 Colo. 175, 49 Pac. Rep. 286; State v. Gleason, *supra;* State, *ex rel.* Lloyd v. Elliott, 13 Utah 200, 44 Pac. Rep. 248.

In the language of Mr. Justice WESCOTT in State v. Gleason, *supra* (text 225), "The office of Attorney General is, in many respects, judicial in its character, and he is clothed with a considerable discretion. The appropriate and proper function of courts is to hear causes that the citizen of the State may see proper to institute, and there are but few cases in which they can exercise a discretion to refuse to hear them. The Attorney General being intimately associated with the other departments of the Government, being as well the proper legal adviser of the Executive as the legislative department of the Government, it is highly proper, whenever the right to a public office is to be tried, that he should be clothed with discretion in the premises which should be exercised at least *independently of the courts in actions of this character."* (Italics supplied.) "This discretion is vested in the Attorney General; if he exercises it improperly, there is another tribunal, the people, or their grand inquest, the Assembly, to punish him."

It is not a question of the sufficiency in law of the allegations of the information, nor of discretion in the court as to whether the writ shall issue. It issues on demand of the sovereign power speaking through the Attorney General. It is for him, the spokesman of the Government, the legal representative of the sovereign, to determine whether the public requires him to proceed. That responsibility cannot

in a case like this be passed to "so-styled" relators or the Court. The latter upon such a demand must proceed to hear and determine the cause on its merits and the questions of law arising upon them.

We have read with much interest the discussion in the brief of counsel appearing for the "so-styled" co-relators on the subject of the political and economical policy of the encouragement of the organization and activities of great corporations and the asserted menace of large aggregations of capital in business activities. They have written a very interesting, if not wholly convincing, brief, and displayed evidence of much research in the history, growth and economical value of corporations generally. Those arguments we think in a proper case would commend themselves to legislative judgment where we think the controversy might more appropriately be determined.

There is a school of political philosophy differing from that described so extensively in quotations in the brief from the dissenting opinion of Mr. Justice BRANDEIS of the Supreme Court of the United States in Liggett Co. v. Lee, 77 U. S. Sup. Ct. Law Ed., Advance Opinions, 553, text 564, and that is that "Big Business," as exemplified in the chain store and other corporations of an industrial character, is both a boon and an evil. In merchandising, the chain store seems to be a very generally accepted method of retail distribution. It would seem to be economically sound, otherwise it would not have spread so extensively and so rapidly, said Honorable Emanuel Celler, a member of Congress from New York State.

He said that it is universally recognized in the United States and is rapidly taking root in Canada, England and Europe. They seem to be the result of the rapidly changing social conditions produced by the industrial and so-called

machinery age with its mass production and mass sale, is the view entertained by a large number of economists. In any case these are legislative, not judicial questions, and a court goes somewhat beyond the limits of its particular function when it discusses economic questions to justify legislative action taken within the sphere of economic questions to justify legislative action taken within the sphere of its own powers.

Certainly industrial, social, political and economical questions of today may not be compared with such conditions as existed in the days of the full maturity of the ancient Greek and Roman power to the end that a lesson of decadence may be given to our present generation and its method of treating such questions. Whether the elimination of the independent merchant and the substitution in his place of the chain-store method of distribution of commodities is an unmixed calamity is certainly not a judicial question. It is one which by reason of its very nature comes within the power of the sovereign by its public assemblies, the Legislatures, to discuss and settle for us, the people, who look to such authority and power for our rules of social and political intercourse. If chain activities are a menace which the courts may eliminate by judicial order, will the judiciary be required to put its order of suppression upon chain newspapers?

The motion to dismiss the information and demurrer to it are overruled and the respondent is given twenty days from this date in which to interpose its answer or plea.

TERRELL, BROWN and BUFORD, J. J., concur.

WHITFIELD, J., concurs specially.

DAVIS, C. J., dissents.

WHITFIELD, J. (concurring specially). — The Attorney General of Florida filed in this Court an information in the

nature of quo warranto against a foreign corporation, upon which information a writ was issued commanding the respondent "to show cause why said respondent should not be ousted of its permit to do business in Florida and why it should not be canceled" for alleged violation of statutes of the State. The respondent demurred to, and moved to quash the information challenging the use of the writ and the sufficiency of the information.

The statutes of the State of Florida provide:

"No foreign corporation shall transact business, or acquire, hold or dispose of property in this State until it shall have filed in the office of the Secretary of State a duly authenticated copy of its charter or articles of incorporation, and shall have received from him a permit to transact business in this State; * * *."   Sec. 6026 (4095), C. G. L.

A permit was issued to the respondent foreign corporation.

Sections 7944 (5719), *et seq.*, Article XII, pages 3710, *et seq.*, C. G. L., contain regulations and prohibitions with reference to combinations in restraint of trade and other anti-trust provisions:

Section 7947 (5722) of the statute provides that:

"Any foreign corporation violating any of the provisions of this article is hereby denied the right, and prohibited from doing any business within this State, and it shall be the duty of the Attorney General to enforce this provision by injunction, or other proper proceedings, in the name of the State of Florida."

The duty of the Attorney General is mandatory when a violation of the statute is made to appear and he has the choice of the judicial remedies that may be afforded "by injunction or other proper proceedings."

An information in the nature of quo warranto having been filed by the Attorney General, the State is entitled to the processes of the court thereunder if the writ and the proceedings consequent thereon may legally be made applicable in the case.

Quo warranto may be used to adjudicate the right of a foreign corporation to continue doing business in a State under a permit from the State when such foreign corporation is violating the laws of the State in which it is doing business by virtue of its permit. See 51 C. J. 322; Standard Oil Co. v. Missouri, 218 Mo. 1, 224 U. S. 270, 32 Sup. Ct. 406, Ann. Cas. 1913 D 936; State v. Virginia-Carolina Chemical Co., 71 S. C. 544, 51 S. E. Rep. 455. See also 41 C. J. 207; 14 C. J. 1293; State v. B. C. & M. R. R. Co., 25 Vt. 433; State v. American Book Co., 65 Kan. 847, 69 Pac. Rep. 563; State v. Kansas Natural Gas Co., 71 Kan. 785, 81 Pac. Rep. 506; State v. Western Union Mut. Life Ins. Co., 47 Ohio St. 167, 24 N. E. Rep. 392; Wolverine Fish Co., Attorney General, *ex rel.* v. A. Booth & Co., 143 Mich. 89, 106 N. W. Rep. 868.

Authorities entitled to consideration indicate that an information in the nature of quo warranto may be used in cases of this nature, and as such use does not appear to conflict with any statute of this State, it may fairly be regarded as being included in the expression "other proper proceedings" in Section 7947 (5722), C. G. L.

The writ being appropriate, the parties to and the allegations of the information, which are unnecessary when the proceeding is by the Attorney General for the State, may be regarded as surplusage, since they do not negative the right of the State to the writ.

TERRELL and BUFORD, J. J., concur.

DAVIS, C. J. (dissenting).—This is a quo warranto pro-

ceeding. The respondent is a foreign, not a domestic corporation. Two sections of the Florida anti-trust statutes deal with foreign corporations and domestic corporations separately. The first section is Section 7945, C. G. L., 5720, R. G. S., which applies in terms only to domestic corporations as the following quotation of that section will show:

"*Forfeiture of Charter. of Domestic Corporations for Violations.*—Any corporation holding a charter under the laws of the State of Florida which shall violate any of the provisions of this Article ·shall thereby forfeit its charter and franchise, and its corporate existence shall cease and determine." (Ch. 6933, Acts 1915, Sec. 2.)

As will be noted, the right of the Attorney General to proceed by *quo warranto* is limited to cases wherein a "domestic" corporation has violated any provisions of Section 7944, C. G. L., 5719, R. G. S., to 7954, C .G. L., 5729, R. G. S., respectively.

Section 7947, C. G. L., 5722, R. G. S., reads as follows:

"*Foreign Corporations Violating Article Denied Right to do Business in State.*—Every foreign corporation violating any of the provisions of this Article is hereby denied the right, and prohibited from doing any business within this State, and it shall be the duty of the Attorney General to enforce this provision by injunction, or other proper proceedings, in the name of the State of Florida." (*Id.,* Sec. 4.)

In cases where a *foreign* corporation (as in this case) is alleged to have violated the anti-trust laws, only its right to do business in this State is "denied" and may be formally terminated by judicial proceedings in the form of injunction "or other appropriate proceedings" in the name of the State of Florida. Quo warranto is not a proceeding

akin to injunction. Nor is it "appropriate" to be employed as a "proceeding" for prohibiting a foreign corporation from "doing business" in this State. This is so because the statutes do not undertake to destroy the right of a foreign corporation to act in a corporate character by way of a penalty for violating the law, but simply operates to "deny" its right to continue to "do business" in Florida in violation of our anti-trust statutes, whether it has previously secured from the State a permit to act in its corporate character as a foreign corporation or not.

Many foreign corporations hold no specific permits from the Secretary of State because they have been specifically exempted from our foreign-corporation statutes requiring permits to be secured. See Section 6013, C. G. L., 4100, R. G. S. But if such foreign corporations violate the anti-trust laws they are nevertheless subject to injunction as provided by Section 7947, C. G. L., *supra*.

My view is that injunction, not quo warranto, is the proper remedy for the complainant asserted in the information in the case and that quo warranto does not lie against a foreign corporation under Section 7947, C .G. L., as a means of enforcing our anti-trust statutes. So the demurrer should be sustained in my opinion in view of the fact that the information is in specific, not general terms, and shows that it is an attempt to use quo warranto under Section 4947, C. G. L.