IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

ZOLTAN BARATI,

        Appellant,

v.

STATE OF FLORIDA,
MOTOROLA, INC., and
MORPHOTRAK, INC.,

        Appellees.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-213

Opinion filed February 23, 2016.

An appeal from the Circuit Court for Leon County.
Angela C. Dempsey, Judge.

David W. Moyé, Moyé Law Firm, Tallahassee; Gary M. Farmer, Jr. and Gary M. Farmer, Sr. of Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, PL, Fort Lauderdale, for Appellant.

Pamela Jo Bondi, Attorney General, Russell S. Kent, Special Counsel, William E. Foster, Assistant Attorney General, Tallahassee, for Appellee State of Florida.

THOMAS, J.

In this *qui tam* proceeding filed under the Florida False Claims Act (FCA), we are presented with a question of first impression,[1] to wit: Does the Attorney

---

[1] This court previously rejected the Attorney General's assertion in this case that the circuit court lacked jurisdiction to consider Appellant's motion to strike the State's Notice of Voluntary Dismissal. Without reaching the issue addressed here,

General possess the requisite legal authority to dismiss a pending *qui tam* action notwithstanding her previous decision to decline to intervene in the action? The Attorney General asserts that a *qui tam* action is strictly statutory in nature, the State is the real party in interest, and the State possesses the substantive right to dismiss this statutory cause of action at any time during the litigation. To hold otherwise, the State argues, would violate organic law prohibiting either the legislative or judicial branches from interfering in the exercise of prosecutorial discretion by the executive branch to decide that dismissing a *qui tam* claim in state court is properly within the public interest of the State of Florida.

Appellant (relator) argues that under the "public policies embedded in the False Claims Act" and the legislative history of the Act, the relator who litigates a *qui tam* action must be provided a court hearing to challenge the Attorney General's voluntary dismissal. To allow the Attorney General to dismiss any *qui tam* action, regardless of prior participation by the State, and regardless of the relator's investment of resources in the litigation, would "severely undermine[]"

we denied the State's Petition for Writ of Prohibition which sought to prohibit the trial court from conducting a hearing on Appellant's motion to strike. State v. Barati, 150 So. 3d 810 (Fla. 1st DCA 2014) (Thomas, J., dissenting). We again reject the State's argument raised here that this court lacks jurisdiction to consider this appeal as, on remand, the lower court's order found that the State's dismissal divested it of jurisdiction to consider Appellant's motion to strike. We agree with Appellant that the lower court's Order on Remand concluded judicial labor, and that order is now reviewable here. Bennett's Leasing, Inc. v. First St. Mortgage Corp., 870 So. 2d 93, 96 (Fla. 1st DCA 2003) ("The basic rule is that a judgment or order is final if it brings to a close all judicial labor in the lower tribunal.").

2

the "False Claims Act's role in combatting fraud against the government," according to the relator.

We hold that the Attorney General possesses the plenary authority to unilaterally dismiss a *qui tam* action, regardless of the State's decision to decline to previously intervene in the litigation. We reach this conclusion based on four reasons: First, based on our analysis of the plain language of the statute, we conclude that the Legislature intended to confer this substantive authority to the Attorney General; second, based on our review of the relevant case law interpreting the very similar Federal False Claims Act, we find ample support for our reasoning; third, based on Florida's strict separation of powers mandated in Florida's organic law under Article II, section three, we reason that to interpret the statute to allow a relator to challenge the Attorney General's decision would place the relevant statute in constitutional jeopardy; and fourth, and finally, we conclude that the Attorney General's constitutional authority under Article IV, section four of the Florida Constitution, mandates that her office is accorded the unilateral authority to dismiss a *qui tam* action, without challenge from a relator, absent any allegation of fraud not present here. In fine, we hold that the authority of the Attorney General to voluntarily dismiss the *qui tam* action is a substantive right firmly grounded on statutory and state-constitutional principles.

## Factual and Procedural Background

As described in <u>State v. Barati</u>, 150 So. 3d 810, 811-12 (Fla. 1st DCA 2014),

which did not reach the merits of the question presented here, the following history

is useful:

> In September 2009, Barati filed a *qui tam* action against Motorola,
> Inc., pursuant to the Florida False Claims Act, section 68.081 *et seq.,*
> Florida Statutes. . . .
>
> The Florida False Claims Act authorizes a private person or the State
> to initiate a civil action against a person or company who knowingly
> presents a false claim to the State for payment. The private citizen
> who brings an action, i.e., the "relator," sues on behalf of himself and
> the State. Such an action is called a *qui tam* action from the Latin
> phrase: *"qui tam pro domino rege quam pro se ipso in hac parte
> sequitur." Black's Law Dictionary* translates the phrase as: "who as
> well for the king as for himself sues in this matter." . . .
>
> After being served a copy of the *qui tam* complaint and relevant
> materials, the State of Florida conducted an investigation, pursuant to
> section 68.083(3), Florida Statutes. The State declined to join the *qui
> tam* action, which Barati thereafter prosecuted for approximately three
> and a half years. Without formally intervening in the cause, the
> Attorney General, on behalf of the State, filed a notice of voluntary
> dismissal of the action on July 18, 2013. The State asserted in its
> notice that it had the unilateral right to dismiss the action on authority
> of section 68.084(2) (a), notwithstanding any objections that Barati
> may have.
>
> Barati thereafter moved to strike the notice of voluntary dismissal
> arguing *inter alia* that dismissal did not occur automatically, as the
> State was suggesting.

Following our denial of the Attorney General's petition for writ of

prohibition, the lower court ruled that the "Attorney General had the authority to

file a voluntary dismissal notwithstanding any objections of the Relator pursuant to Section 68.084(2), Florida Statutes." By our holding today, we affirm that ruling.

## Analysis

### 1. The Plain Language of the Statute

Our standard of review here is *de novo,* as we address a pure question of law. Myers v. State, 866 So. 2d 103, 104 (Fla. 1st DCA 2004).

As we are bound to interpret the statute as a whole, we provide the following relevant text of the 2009 Florida False Claims Act, emphasizing provisions that describe the State's overarching legislative policy in authorizing *qui tam* actions:

**68. 082 False Claims against the state; . . . liability.—**
. . . . .
   (2)  Any person who:
   (a)  Knowingly presents or causes to be presented . . . a false or fraudulent for payment or approval;
. . . .
   (g)  . . . . is liable to the state for a civil penalty . . . and for treble the amount of damages the agency sustains because of the act or omission of that person.
   (3)  The court may reduce the treble damages . . . in which case the court shall award no less than 2 times the amount of damages sustained by the agency because of the act of the person. . . .

**68.083  Civil Actions for false claims.—**
   (1)  The department [of Legal Affairs] may diligently investigate a violation under s. 68.082. . . . [T]he department may bring a civil action under the Florida False Claims Act against the person [who has allegedly violated s. 68.082]. . . .
   (2)  A person may bring a civil action for a violation of s. 68.082 for the person and for the affected agency. Civil actions instituted under this act shall be governed by the Florida Rules of Civil Procedure and **shall be brought in the name of the State of Florida**.

5

Prior to the court unsealing the complaint under subsection (3), the action may be voluntarily dismissed by the person bringing the action **only if the department gives written consent to the dismissal and its reasons for such consent.**

. . . .

(7)  When a person files an action . . . no person **other than the department** on behalf of the state may intervene . . . under this act . . . .

**68.084  Rights of the parties in civil actions.—**
(1)  If the department, on behalf of the state, proceeds with the action, it has the primary responsibility for prosecuting the action, and is not bound by any act of the person bringing the action. The person bringing the action has the right to continue as a party to the action**, subject to the limitations specified in subsection (2)**.

(2)(a)  **The department may voluntarily dismiss the action notwithstanding the objections of the person initiating the action.**[2]

---

[2] Effective June 30, 2013, the Florida FCA was amended. See Ch. 2013-104, Laws of Fla. The Legislature added language to this subsection, which provides:  "The department may '**at any point**' voluntarily dismiss the action notwithstanding the objections of the person initiating the action." § 68.084(2)(a), Fla. Stat. (2013) (emphasis added).  In addition, in defining the statute of limitations period for *qui tam* claims, the Legislature amended the 2009 statute to define the limitations term **solely** on the basis of the Attorney General's knowledge of the facts giving rise to the claims. § 68.089(1), Fla. Stat. (2013).  The statute also only authorizes the application of estoppel in *qui tam* suits brought by the Attorney General, not by private relators. § 68.09(2), Fla. Stat. (2013).  Furthermore, the 2013 Legislature provided more control of *qui tam* actions to the Attorney General in other significant provisions.  The 2013 amendments require the court to dismiss an action, "unless opposed by the department," if the *qui tam* action is based on information previously publicly disclosed. § 68.087(3), Fla. Stat. (2013).  Thus, the 2013 Legislature directed that *qui tam* actions cannot be based on publicly-disclosed information, but in a significant exception, the statute now allows the Attorney General to preclude dismissal by the court.  No other party is given this authority where the *qui tam* action is based on public information.  This is further evidence of the overarching and continuing legislative intent to vest almost complete authority in the Attorney General to conduct and control *qui tam* litigation, and these statutory amendments provide additional support to our

(b) Subject to s. 17.04, nothing in this act shall be construed to limit the authority of the department or the qui tam plaintiff to compromise a claim brought in a complaint filed under this act if the court determines, **after a hearing,** that the **proposed settlement is fair, adequate, and reasonable under all the circumstances**.

(c) Upon a showing **by the department** that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the department's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, including, but not limited to:

1. Limiting the number of witnesses the person may call;

2. Limiting the length of the testimony of the person's witnesses;

3. Limiting the person's cross-examination of witnesses; or

4. **Otherwise limiting the participation by the person in the litigation**.

(d) Upon a showing by the defendant that unrestricted participation during the course of the litigation **by the person initiating the action** would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

(3) If the department **elects not to proceed** with the action, **the person who initiated the action has the right to conduct the action**. If the Attorney General, as head of the department . . . so requests, it shall be served, at the requesting department's expense, with copies of all pleadings and motions filed in the action and copies of all deposition transcripts. When a person proceeds with the action, the court, **without limiting the rights of the person** initiating the action**, may nevertheless permit the department to intervene and take over the action** on behalf of the state at a later date **upon showing of good cause.**

(4) **Whether or not the department proceeds** with the action, **upon a showing** by the department that certain actions of discovery by the person initiating the action would interfere with an investigation by the state government or the prosecution of a criminal or civil matter arising out of the same facts, **the court may stay such**

---

conclusion that the Attorney General possesses the unfettered right of dismissal.

**discovery for a period of not more than 60 days**. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a **further showing** in camera by the department that the criminal or civil investigation or proceeding has been pursued with reasonable diligence and any proposed discovery in the civil action **will interfere with an ongoing criminal or civil investigation or proceeding**.

(5)  The application of one civil remedy under this act does not preclude the application of any other remedy, civil or criminal, under this act or any other provision of law. Civil remedies under this act are supplemental, not mutually exclusive. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. As used in this subsection, the term "final" means not subject to judicial review.

(6)  The Department of Financial Services, or the department, may intervene on its own behalf as a matter of right.

**68.085.    Awards to plaintiffs bringing action.—**

(1)  If the department proceeds and prevails in an action brought by a person under this act, except as provided in subsection (2), the court shall order the distribution to the person of at least 15 percent but not more than 25 percent of the proceeds recovered under any judgment obtained by the department in an action under s. 68.082 or of the proceeds of any settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

(2)  If the department proceeds with an action which the court finds to be based primarily on disclosures of specific information, other than that provided by the person bringing the action, relating to allegations or transactions in a criminal, civil, or administrative hearing; a legislative, administrative, inspector general, or auditor general report, hearing, audit, or investigation; or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds recovered under a judgment or received in settlement of a claim under this act, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation.

(3)  If the department does not proceed with an action . . . the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil

8

penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds recovered under a judgment rendered in an action under this act or in settlement of a claim under this act.

. . . .

**68.087  Exemptions to Civil Actions.—**

 . . . .

(3)   No court shall have jurisdiction over an action brought under this act based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; in a legislative, administrative, inspector general, or Auditor General, Chief Financial Officer, or Department of Financial Services report, hearing, audit, or investigation; or from the news media, unless the action is brought by the department, or unless the person bringing the action is an original source of the information. For purposes of this subsection, the term "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the department before filing an action under this act based on the information.

(4)   No court shall have jurisdiction over an action **where the person bringing the action** under 68.083(2) is:

(a)   Acting as an attorney for state government; or

(b)   An employee or former employee of state government, and the action is based, in whole or in part, upon information obtained in the course or scope of government employment.

. . . .

**68.089 Limitation    of    actions;    effect    of    intervention    by department.—** A civil action under this act may not be brought:

(1)   More than 6 years after the date on which the violation . . . is committed; or

(2)   More than 3 years after the date when facts material to the right of action are known or reasonably should have been known **by the state official charged with responsibility to act in the circumstances,** but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

**68.09   Burden of proof.—**In any action . . . the State of Florida or the qui tam plaintiff shall be required to prove all essential elements of

the cause of action, including damages, by a preponderance of the evidence.

**68.091  Construction and severability of provisions.—**
    (1)  This act shall be liberally construed to effectuate its remedial and deterrent purposes.

(Emphasis added.)

From a careful analysis of the plain language of this statute, we can discern the legislative scheme *in toto*.  The first overarching statutory interpretation principle applicable here is that all rights granted under the statute to parties other than the Attorney General are strictly cabined by the limitations of the statute. Most importantly for our analysis, there is no common-law right for a relator to file a *qui tam* action:

> *Qui tam* actions appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf. See, *e.g., Prior of Lewes v. De Holt* (1300), reprinted in 48 Selden Society 198 (1931). Suit in this dual capacity was a device for getting their private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests. See Milsom, Trespass from Henry III to Edward III, Part III: More Special Writs and Conclusions, 74 L.Q. Rev. 561, 585 (1958). Starting in the 14th century, as the royal courts began to extend jurisdiction to suits involving wholly private wrongs, the common-law *qui tam* action gradually fell into disuse, although it seems to have remained technically available for several centuries. See 2 W. Hawkins, Pleas of the Crown 369 (8th ed. 1824).
>
> At about the same time, however, Parliament began enacting statutes that explicitly provided for *qui tam* suits. These were of two types: those that allowed injured parties to sue in vindication of their own interests (as well as the Crown's), see, *e.g.,* Statute Providing a

Remedy for Him Who Is Wrongfully Pursued in the Court of Admiralty, 2 Hen. IV, ch. 11 (1400), and—more relevant here—those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves, see, *e.g.,* Statute Prohibiting the Sale of Wares After the Close of Fair, 5 Edw. III, ch. 5 (1331); see generally Common Informers Act, 14 & 15 Geo. VI, ch. 39, sched. (1951) (listing informer statutes). Most, though not all, of the informer statutes expressly gave the informer a cause of action, typically by bill, plaint, information, or action of debt. See, *e.g.,* Bill for Leases of Hospitals, Colleges, and Other Corporations, 33 Hen. VIII, ch. 27 (1541); Act to Avoid Horse–Stealing, 31 Eliz. I, ch. 12, § 2 (1589); Act to Prevent the Over–Charge of the People by Stewards of Court–Leets and Court–Barons, 2 Jac. I, ch. 5 (1604).

For obvious reasons, the informer statutes were highly subject to abuse, see M. Davies, The Enforcement of English Apprenticeship 58–61 (1956)—particularly those relating to obsolete offenses, see generally 3 E. Coke, Institutes of the Laws of England 191 (4th ed. 1797) (informer prosecutions under obsolete statutes had been used to "vex and entangle the subject"). Thus, many of the old enactments were repealed, see Act for Continuing and Reviving of Divers Statutes and Repeal of Divers Others, 21 Jac. I, ch. 28, § 11 (1623), and statutes were passed deterring and penalizing vexatious informers, limiting the locations in which informer suits could be brought, and subjecting such suits to relatively short statutes of limitation, see Act to Redress Disorders in Common Informers, 18 Eliz. I, ch. 5 (1576); Act Concerning Informers, 31 Eliz. I, ch. 5 (1589); see generally Davies, *supra,* at 63–76. Nevertheless, laws allowing *qui tam* suits by informers continued to exist in England until 1951, when all of the remaining ones were repealed. See Note, The History and Development of Qui Tam, 1972 Wash. U.L.Q. 81, 88, and n.44 (citing Common Informers Act, 14 & 15 Geo. VI, ch. 39 (1951)).

*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution. Although there is no evidence that the Colonies allowed common-law *qui tam* actions (which, as we have noted, were dying out in England by that time), they did pass several informer statutes expressly authorizing *qui tam* suits. See, *e.g.,* Act for

11

the Restraining and Punishing of Privateers and Pirates, 1st Assembly, 4th Sess. (N.Y. 1692), reprinted in 1 Colonial Laws of New York 279, 281 (1894) (allowing informers to sue for, and receive share of, fine imposed upon officers who neglect their duty to pursue privateers and pirates). Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes. Like their English counterparts, some of them provided both a bounty and an express cause of action; others provided a bounty only.

Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 774-77 (2000) (holding that *qui tam* relator had Article III standing and such actions were "cases and controversies" based on the "nigh conclusive" history).

Other courts have also recognized that there "'is presently no common-law right to bring a *qui tam* action, which is strictly a creature of statute.'" Stalley ex rel. U.S. v. Orlando Reg'l Healthcare System, Inc., 524 F.3d 1229, 1233 (11th Cir. 2008) (quoting Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007)).

We thus interpret the issue presented within this context: The Legislature is the sole authority of all rights granted private relators to file and litigate *qui tam* actions.

Another overarching principle also must guide our interpretation here, however: The statute must be "liberally construed to effectuate its remedial and deterrent purposes." § 68.091, Fla. Stat. (2009). By this legislative directive, we must interpret the statute in a manner that implements the plain meaning of the law, while ensuring that any contextual boundaries honor the Legislature's intent

12

to assure that false claims are vigorously pursued and that the courts do not unduly interfere with the State's statutory prerogatives to obtain restitution for its losses and to punish those persons and entities which seek to wrongfully defraud the State through double and triple recoveries. § 68.082, Fla. Stat. (2009). But this statement of legislative intent cannot authorize this court to insert new language into the statute not authorized by the Legislature. Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984). To "liberally construe" the plain language of the statute, in other words, we must ensure that our interpretation does no harm to the overall legislative scheme, which is to remedy wrongs committed against the State when false claims are filed, but to do so in recognition of the Attorney General's extensive control of *qui tam* litigation and the courts' responsibility to review settlements of such claims, regardless of whether the Attorney General participates in the action. § 68.084(2)(b), Fla. Stat. (2009). We find no cause to describe the pertinent statutory language as ambiguous; thus, we cannot interpret the statute to modify any substantive rights defined by the Legislature. Id.

The statute limits the relator's rights, which are subject to the express authority of the Attorney General to control and direct such litigation. §§ 68.083, 68.084, Fla. Stat. (2009). The Attorney General exercises the initial authority to decide whether to file the action, either on the Attorney General's own initiative or after an investigation of a claim filed by the relator. The Attorney General retains

13

the discretionary authority to allow the relator to file the action, but if such is allowed, the relator cannot voluntarily dismiss an action without the express consent of the Attorney General. § 68.083, Fla. Stat. (2009). Thus, the Attorney General controls the power of the relator to end the litigation.

Further demonstrating the deference to the Attorney General's authority to prosecute *qui tam* claims, the statute provides that no other party may intervene in an action filed by a relator, except the Attorney General. § 68.083(7), Fla. Stat. (2009).

Finally, the statute authorizes the court to allow the Attorney General to intervene in a *qui tam* action after a relator has initiated the litigation, but only upon a showing of "good cause" by the Attorney General. § 68.084(3), Fla. Stat. (2009). This limitation to intervene is significant. But no such limitation is imposed on the Attorney General to **dismiss** an intervenor's action. § 68.084(2), Fla. Stat. (2009). In addition, nowhere in the statute is the court authorized to evaluate or deny the Attorney General's decision to terminate *qui tam* litigation. Thus, the Legislature has determined that when the Attorney General intervenes in *qui tam* litigation, the Attorney General must present good cause to justify the intervention. But the Attorney General's decision to terminate the litigation is unlimited by statute. Id.

14

## 2. Case Law Interpreting the Federal False Claims Act

Federal case law interpreting the Federal FCA is persuasive here, as the Florida Legislature patterned the State's *qui tam* statute after the federal law, with some notable and significant differences discussed below. See House of Representatives Committee on Judiciary, "Bill Analysis and Economic Impact Statement," Feb. 22, 1994 ("HB 1184 creates Florida's False Claims Act. The Act is patterned after the Federal False Claims Act and authorizes the Attorney General, the Comptroller or private individuals to bring actions on behalf of the state or its agencies against individuals who have made false claims against the state."; "Effect of Proposed Changes: HB 1185 creates Florida's False Claims Act. The act is crafted after the Federal False Claims Act . . . ."). However, there are substantive policy differences embodied in the federal and state laws, most importantly, that under federal law, the relator is entitled to a hearing before the government may dismiss an action in which it has declined to intervene. But the Florida Legislature declined to provide such a procedure to the State *qui tam* relator. Cf., § 68.084(2)(a) with 31 U.S.C. § 3730(c)(2)(a). Yet even under the Federal FCA, which grants relators the right to a hearing, federal courts have accorded broad authority to the United States to dismiss a federal *qui tam* action.

In Kellogg Brown & Root Services v. United States ex rel. Carter, 135 S. Ct. 1970 (2015), Justice Alito, writing for a unanimous United States Supreme Court,

15

described the statutory structure of the Federal False Claims Act as follows:

> In a *qui tam* suit under the FCA, the relator files a complaint under seal and serves the United States with a copy of the complaint and a disclosure of all material evidence. § 3730(b)(2). After reviewing these materials, the United States may "proceed with the action, in which case the action shall be conducted by the Government," or it may "notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." § 3730(b)(4). **Regardless of the option that the United States selects, it retains the right at any time to dismiss the action entirely**, § 3730(c)(2)(A), or to settle the case, § 3730(c)(2)(B).

135 S. Ct. at 1973-74 (emphasis added).

In Ridenour v. Kaiser-Hill Company, LLC., 397 F.3d 925, 932 (10th Cir. 2005), the majority "decline[d] to construe the FCA as requiring intervention for cause before dismissal because a plain reading of the statute would not require it, canons of statutory construction do not support such a result, and in our view, such a reading would render the FCA constitutionally infirm." Applying statutory construction principles, the court found that nothing in the language of the Federal FCA suggests that the authority of the government to dismiss a *qui tam* action is dependent upon prior intervention. Further, the Ridenour court noted that in Swift v. United States, 318 F.3d 250, 251 (D.C. Cir. 2003), *cert. denied*, 539 U.S. 944 (2003), the D.C. Circuit also held that the government need not first intervene in a *qui tam* action before moving to dismiss and found that intervention was only necessary if the government wished to "proceed with the action." The court in Ridenour found that its holding comported with constitutional concerns, noting the

16

FCA had been challenged several times on the basis that it violated the separation of powers doctrine. 397 F.3d at 934. The court concluded that "to condition the Government's right to move to dismiss an action in which it did not initially intervene upon a requirement of late intervention tied to a showing of good cause would place the FCA on constitutionally unsteady ground." Id.

The Fifth Circuit has also interpreted the Federal FCA in a manner that would accord great deference to the United States to dismiss a *qui tam* action, regardless of whether the government had intervened. Riley v. St. Luke's Episcopal Hosp., 252 F.3d 749 (5th Cir. 2001) (en banc). In Riley, the en banc court reversed a panel decision which had held that the FCA violated the separation of powers under the Take Care and Appointments Clauses of Article II of the United States Constitution by entrusting to a private relator executive powers belonging solely to the President. In reversing the panel's decision, the en banc majority opinion grounded its reasoning on the control the United States retained over a relator's litigation, including the power to dismiss the litigation:

> In *Searcy v. Phillips Electronics N. Am. Corp., et. al.*, 117 F. 3d 154 (5th Cir. 1997), we held that the (federal False Claims Act) clearly permits the government to veto settlements by a qui tam plaintiff even when it remains passive in the litigation. We cited several ways in which the government may assume control over qui tam litigation in which it does not intervene under the FCA. . . . This Court also stated that the government retains the unilateral power to dismiss an action "notwithstanding the objections of the person."

17

Id. at 753. It is significant that in its en banc decision, the Fifth Circuit addressed the government's power to dismiss the relator's litigation, regardless of whether the government had intervened, to uphold the FCA's constitutionality against a separation of powers challenge. As discussed below, Florida's explicit and strict separation of powers requires a similar analysis.

The Ninth Circuit Court of Appeals reached a similar conclusion in United States ex rel. Kelly v. The Boeing Company, 9 F.3d 743 (9th Cir. 1993). In rejecting an argument that the Federal FCA violated the separation of powers doctrine embedded in the United States Constitution, which as noted below is not as strict as the provision in the Florida Constitution, the Ninth Circuit stated that it agreed with the holding in Juliano v. Federal Asset Disposition Association, 736 F. Supp. 348 (D.DC. 1990), *aff'd,* 959 F.2d 1101 (D.C. Cir. 1992), wherein the district court "stated that in order to avoid serious constitutional questions . . . it would interpret the Act's provision that the 'Government may dismiss the action notwithstanding the objections' of the relator to apply to actions in which the government **had not already intervened**." Kelly, 9 F.3d at 753 n.10 (quoting Juliano, 736 F. Supp. at 351; emphasis added). The Ninth Circuit commended the district court's interpretation and noted that "we believe that the court's interpretation . . . is entirely appropriate and provides an illustration of the meaningful control which the Executive Branch can exercise over qui tam

18

actions." Id. These decisions provide further support for our holding that the Attorney General may dismiss a *qui tam* action, regardless of whether she intervenes before dismissing the action.

In our view, the overarching principle at issue in these cases and in the instant case flows from one fundamental fact: The relator is only the assignee of the government under both statutes, despite the federal law's broader language allowing the relator to demand a hearing where the government seeks to dismiss.

We find that the decision in United States ex rel. Eisenstein v. City of New York, 556 U.S. 928, 932-33 (2009), does not compel a different result. In Eisenstein, the Court was presented with the question of whether the United States was a party to a *qui tam* action, when the government had declined to intervene; the relator filed the notice of appeal 54 days after its claim was dismissed by the district court, seeking to vicariously utilize the government's statutory authority to file a notice of appeal within 60 days. The relator asserted the government was a "party" as defined by the applicable federal rules, notwithstanding the United States' decision declining to intervene. The United States Supreme Court rejected the relator's argument. Id. at 932-33.

We do not think Eisenstein compels a contrary holding in this case for two reasons. First, that decision did not specifically address the question here: Whether the United States, under the FCA, could indeed dismiss a relator's *qui tam*

19

suit, notwithstanding the relator's objections. Second, the relevant language in Eisenstein that would support Appellant's position here cannot be logically reconciled with the Supreme Court's later language in Kellogg Brown that "regardless of the option" the United States pursues regarding intervention, "it retains the right at any time to dismiss the action entirely." Kellogg Brown, 135 S. Ct. at 1973-74.

Our view regarding the United States Supreme Court's statements on the government's dismissal authority in *qui tam* litigation is consistent with other federal courts interpreting Eisenstein. In United States ex rel. Schweizer v. Océ N.V., 677 F.3d 1228, 1233 (D.C. Cir. 2012), for example, an employee sued her former employer under the FCA and retaliation provisions, but the government moved to dismiss the *qui tam* claims after reaching a settlement agreement with the employer. Id. at 1229. The district court granted the motion, over Schweizer's objection. Id. The opinion notes that the government declined to intervene in the *qui tam* action, but "remained an active participant in settlement discussions." Id. at 1231. The employer and the government reached an agreement to dispose of the *qui tam* counts without Schweizer's further involvement. Id. at 1231-32. The government filed its notice of intervention and corresponding motion to dismiss. Id. Schweizer opposed the settlement and motion to dismiss, asserting that the settlement understated the employer's actions and could not satisfy the criteria

20

under section 3730(c)(2)(B) that allowed the government to "settle [a *qui tam*] action . . . notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." § 3730(c)(2)(B).

The government had two responses, asserting first that the district court could dismiss the two counts, over Schweizer's objection, pursuant to section 3730(c)(2)(A) without reviewing the settlement, as it allowed the government to dismiss over the objections of the relator if the relator has been notified and given an opportunity for a hearing on the motion to dismiss. Id. at 1232.

In its analysis, the Court of Appeals stated in Schweizer:

As a preliminary matter, Schweizer claims the government may not invoke § 3730(c)(2)(A) because it never properly intervened in the case. She points out that the Act prescribes only two ways for the government to intervene: during an initial sixty-day window (subject to extension by the district court), § 3730(b)(4); or 'at a later date upon a showing of good cause,' § 3730(c)(3). Because the government declined to intervene during the initial sixty-day period, and did not invoke subsection (c)(3) or show good cause in its later filing, it never became a party to the suit. Thus, Schweizer concludes, the government could not properly move for dismissal.

Schweizer's view of the Act's intervention provisions is not accurate. Intervention is necessary "only if the government wishes to 'proceed with the action.'" *Swift [v. United States,* 318 F.3d 250, 251 (D.C. Cir. 2003)] (quoting 31 U.S.C. § 3730(b)(2) & (b)(4)(A)). Here, the government did not seek to proceed with the *qui tam* portion of the case; it sought to end it. It follows that the government did not have to intervene before filing its motion. *Swift,* 318 F.3d at 251–52. Nothing in *United States ex rel. Eisenstein v. City of New York,* 556 U.S. 928, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009), which addressed the

21

government's party status for purposes of the Federal Rules of Appellate Procedure, is to the contrary. Nor does it matter that the government moved to dismiss outside the initial sixty-day intervention period. *See* [*United States ex rel. Hoyte v. Am. Nat'l Red Cross,* 518 F.3d 61, 63-65 (D.C.Cir.2008)].

Id. at 1233.

### 3. The Status of the Attorney General in *Qui Tam* Actions

Under the Florida FCA, the Attorney General is the real party in interest with the substantive authority to dismiss the action regardless of her prior intervention the suit. This conclusion is based on the statutory provisions discussed above. As the real party in interest, the Attorney General possesses the sole substantive power of dismissal; the relator is and always remains an assignee of the State's substantive right to prosecute a *qui tam* action, albeit an assignee with some procedural prerogatives strictly defined by positive law and in no manner arising out of a common law or constitutional substantive ground.

The Attorney General's authority to dismiss a relator's suit under section 68.084(2)(a), Florida Statutes, is substantive:

> *Substantive law* has been defined as that part of the law which creates, defines and regulates rights, or that part of the law which courts are to administer. It includes those rules and principles which *fix and declare the primary rights of individuals with respect towards their persons and property.* On the other hand, *practice and procedure* "encompasses the *course, form, manner, means, method, mode, order, process or steps by which a party enforces substantive rights* or obtains redress for their invasion. 'Practice and procedure' may be described as the machinery of the judicial process as opposed to the

product thereof." It is the method of conducting litigation involving rights and corresponding defenses.

Abdool v. Bondi, 141 So. 3d 529, 538-40 (Fla. 2014) (emphasis in original) (quoting Massey v. David, 979 So. 2d 931, 936-37 (Fla. 2008)).

Here, the dismissal provision is a substantive law, because it defines and creates the property right to maintain a *qui tam* action. See Adhin v. First Horizon Home Loans, 44 So. 3d 1245 (Fla. 5th DCA 2010). In Adhin, the Fifth District held that a statute requiring holders of unrecorded property interests to intervene within 20 days after the recording of a *lis pendens* was constitutional, because the statute primarily affected substantive property rights, not procedural rights, essentially creating a "nonclaim" statute and a statute of repose; thus, the statute directly created or eliminated property rights. Here, the *qui tam* statute clearly creates, defines and limits substantive rights possessed by the State to maintain a *qui tam* suit in which damages may be obtained. Thus, the State's authority to terminate the action is substantive.

To the extent the Florida Rules of Civil Procedure might conflict with section 68.084(2)(a) regarding the party status of the Attorney General, the Rules of Civil Procedure must yield, as only the Florida Legislature can define substantive law under Florida's strict separation of powers requirement. Art. II, § 3, Fla. Const.; Abdool, 141 So. 3d at 538.

Before addressing the other constitutional principles relevant here, we note that federal courts have also acknowledged that to interpret the Federal FCA in a manner to impede the Executive Branch's control over the litigation would place that statute on unsteady constitutional *terra firma.* In Ridenour, the court noted that, in United States ex rel. Stone v. Rockwell International Corp., 282 F.3d 787 (10th Cir. 2002), it had previously reserved the question of whether the *qui tam* provision would pass constitutional muster if the government was denied intervention for cause, as the government in Stone had successfully intervened, showing good cause. Ridenour, 397 F.3d at 934. The Ridenour court, analyzing its prior opinion in Stone, noted that Stone cited favorably to decisions from other circuits that had found the Federal FCA as "constitutionally sound as long as it is interpreted as vesting in the Executive Branch sufficient control over *qui tam* actions so there is no violation of its duty to enforce the laws of the land." Id.

The Ridenour majority, however, did not rule on the constitutionality of the issue by construing the statute in such a way that the constitutionality question could be avoided, and noted that if the government's right to dismiss when it intervened at a later date was tied to a showing of good cause, such an interpretation would place the FCA on "constitutionally unsteady ground." Id. Significantly, the majority opinion in Ridenour rejected the dissenting opinion's

24

view that the government would be required to intervene on a showing of "good cause," before it could be allowed to dismiss the action.

### 4. Interpreting the Florida False Claims Act Consistent With Article II, Section Three and Article IV, Section Four of the Florida Constitution

The Florida Constitution imposes a strict, explicit and textual separation of powers requirement on all three branches of state government:

> **Branches of government.**—The powers of the state government **shall be** divided into legislative, executive and judicial branches. **No person** belonging to one branch shall exercise **any powers** appertaining to either of the other branches unless **expressly provided** herein.

Art. II, § 3, Fla. Const. (emphasis added). It would be hard to compose a more demanding requirement in organic law than this, which not only requires an explicit separation of the legislative, judicial and executive powers, but specifies that no one governmental official is to exercise "any" power "appertaining to either of the other branches." By comparison, the United States Supreme Court has described the separation of powers federal constitutional doctrine in less comprehensive terms, stating that "the Constitution by no means contemplates total separation" of the three branches of government. Buckley v. Valeo, 424 U.S. 1 (1976).

In contrast, the Florida Supreme Court has recognized and held that Florida's superior organic law imposes a more vigorous separation of powers

25

constitutional requirement than does the federal constitution. B.H. v. State, 645 So. 2d 987 (Fla. 1994). This principle becomes even more significant in considering that federal courts have recognized that even under the United States Constitution, there exist separation-of-power concerns where a *qui tam* plaintiff's assertions may jeopardize the government's exercise of its executive powers.

In B.H., the Florida Supreme Court addressed a statute that purported to authorize an administrative agency to define the elements of the crime of escape committed by a juvenile offender. The Court stated the following regarding the State's more stringent separation of powers requirement:

> We now turn to Florida law on the same question [of the nondelegation doctrine]. Any discussion must begin by noting several special features of the state Constitution, which we are required to honor under the doctrine of primacy notwithstanding less stringent federal law. Traylor v. State, 596 So. 2d 957 (Fla. 1992). . . .
>
> The prohibition contained in the second sentence of Article II, section 3 of the Florida Constitution could not be plainer, as our cases clearly have held. **This Court has stated repeatedly and without exception that Florida's Constitution absolutely requires a 'strict' separation of powers.** Cases on this point are numerous . . . .
>
> . . .
>
> Moreover, unlike the apparent federal approach, Florida has not relied on implied powers, arguments of experience or necessity, or any penumbral theory in gauging the contours of the separation of powers . . . given to different branches of government. What the Constitution's plain language says on this subject **is what the courts of Florida enforce.** If a statute purports to give one branch powers textually assigned to another by the Constitution, then that statute is unconstitutional.

26

645 So. 2d at 991-92 (emphasis added).  It is in this context that we must resolve the issue *sub judice*.

To answer the question of how the statute comports with the separation of powers, we must turn to the powers at issue.  Florida's organic law entrusts in the article defining the "Executive," the designation of the Attorney General as the state's "chief legal officer."  Art. IV, § 4(b), Fla. Const.  In addition, the Attorney General serves as one of three members of the Cabinet.  Art. IV, § 4(a), Fla. Const.  The Attorney General is one of three officers of the Executive who serves, with the Governor as chair, on the State Board of Administration.  Art. IV, § 4(d), Fla. Const.  Thus, in the plain, textual organic law, the Attorney General possesses the State's executive authority to serve as the State's chief legal officer.

In addition, under general law, the Attorney General "[s]hall appear in and attend to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state may be a party, or in anywise interested, in the Supreme Court and district courts of appeal of this state [and shall] appear and attend to such suits or prosecutions in any other of the courts of this state . . . ."  § 16.01(4) & (5), Fla. Stat.

The organic and statutory law are not the only sources of authority of the Attorney General; the common law provides the Attorney General the authority to intervene in matters of "compelling public interest," as recognized by the Florida

27

Supreme Court in State ex rel. Shevin v. Yarborough, 257 So. 2d 891, 893-94 (Fla. 1972), when it noted that "[t]he Attorney General inherited many powers and duties from the King's Counsellor at Common Law," while acknowledging that this common-law authority is subject to legislative definitions of the "outer perimeter" of the Attorney General's authority. Here, the Legislature has specifically authorized the Attorney General to control the contours of *qui tam* litigation, subject to the authority of the judicial branch to approve settlements, but not to disapprove the Attorney General's decision to dismiss such suits.

In Bondi v. Tucker, 93 So. 3d 1106 (Fla. 1st DCA 2012), a case not involving the *qui tam* statute, this court held that unless the Attorney General intervened in a civil action below, she could not appeal that final decision. But those are not the facts here. Here, the Attorney General exercised her authority under the plain language of the *qui tam* statute to terminate *qui tam* litigation in the circuit court. Litigation of a *qui tam* suit is, by its very definition under Florida law, an action "brought in the name of the state." In Bondi, this court recognized the Attorney General's broad authority to act on matters involving the State's legal interests: "We recognize that the 'office of the Attorney-General is a public trust . . . [and that s]he has been endowed with a large discretion . . . in . . . matters of public concern,' State v. Gleason, 12 Fla. 190 (Fla. 1868), and acknowledge and affirm the Attorney General's 'discretion to litigate, or intervene in, legal matters

28

deemed by him [or her] to involve the public interest . . . and [that] his [or her] standing . . . can not be challenged or adjudicated.'" Id. at 1109 (quoting Shevin, 257 So. 2d at 895).

Conducting and terminating legal actions brought in the name of and for the benefit of the State is the *sine qua non* of the State's chief legal officer. § 68.083(2), Fla. Stat. (2009) ("Civil actions instituted under this act shall be governed by the Florida Rules of Civil Procedure and **shall be brought in the name of the State of Florida**." (emphasis added)). A State's chief legal officer without the authority to conduct the State's litigation would be no legal officer at all.

In addition to this logical fact, the Attorney General of Florida is invested with several powers of the Executive Branch; thus, she is far more than only the State's chief legal officer. See Thompson v. Wainwright, 714 F.2d 1495, 1500-1501 (11th Cir. 1983):

> By Florida judicial decisions, the grant of specific state powers to the attorney general does not deprive [her] of the powers belonging to [her] under the common law, which include prosecuting 'all actions necessary for the protection and defense of the property and revenue of the state. . .' *State ex rel. Landis v. S.H. Kress & Co.*, 115 Fla. 189, 155 So. 823, 827 (1934). Also, "it is [her] duty, in the absence of express legislative restrictions to the contrary, to exercise all such power and authority as public interests may require from time to time." Id. Moreover, **in Florida the office of attorney general is in many respects judicial in character,** and [she] is clothed with considerable discretion. *Id.* 155 So. at 828.

The attorney general's authority runs beyond responsibility to the government *qua* government. [She] is responsible to the people. . . . "The Attorney General is the principal law officer of the state." *Id.* 126 So. at 377.

We conclude that under these powers granted by the Florida common law, statutes and case law, the state's attorney general had the authority to expressly waive exhaustion of state remedies so that all claims could be presented and decided in one federal proceeding. Florida law gives the attorney general authority to waive exhaustion whether exhaustion, as we hold, promotes the interests of the state as sovereign or, as some other courts have held, promotes only the interests of state courts. . . . We hold that, as far as state law is concerned, the attorney general had authority to speak for the interests of state courts and judges as well as the other instrumentalities of Florida state sovereignty. We believe that if the Florida courts were presented with these same questions they would reach the same conclusions.

(Emphasis added.)

Thus, we hold that under the relevant and plain language of the Florida FCA, the constitutional authority of the executive branch vested in the Attorney General of the State of Florida to act as the State's chief legal officer, and the very nature of a *qui tam* suit, the statute is correctly interpreted to authorize the Attorney General to dismiss a relator's *qui tam* action, regardless of whether the Attorney General has previously intervened in the action.

## Conclusion

The voluntary dismissal by the Attorney General in this case was not subject to challenge by Appellant. Thus, the trial court's decision terminating proceedings in this matter was correct; the court properly ruled that it was divested of

jurisdiction when the Attorney General dismissed the action, properly recognizing that the Attorney General "had the authority to file a voluntary dismissal notwithstanding any objections of the Relator pursuant to Section 68.084(2), Florida Statutes."

AFFIRMED.

ROBERTS, C.J., and RAY, J., CONCUR.